1   **WO**

2

3

4

5

6                    **IN THE UNITED STATES DISTRICT COURT**

7                       **FOR THE DISTRICT OF ARIZONA**

8

9   Richard Harley Greenway,              )        No. CV-98-25-TUC-RCC
                                           )
10              Petitioner,                )        <u>DEATH PENALTY CASE</u>
                                           )
11      v.                                 )
                                           )        **MEMORANDUM OF DECISION**
12                                         )        **AND ORDER**
    Dora Schriro, et al.,[1]              )
13                                         )
                Respondents.               )
14  _____)

15          Richard Harley Greenway ("Petitioner") has filed an Amended Petition for Writ of

16  Habeas Corpus pursuant to 28 U.S.C. § 2254 alleging that he is imprisoned and sentenced

17  to death in violation of the United States Constitution.  (Dkt. 61.)[2]  In this order, the Court

18  reviews the merits of Petitioner's remaining claims and addresses a newly-filed motion to

19  amend and request for evidentiary hearing, and determines that Petitioner is not entitled to

20  relief.

21

22  _____

23          [1]      Dora Schriro, Director of the Arizona Department of Corrections, is substituted
    pursuant to Fed. R. Civ. P. 25(d)(1).

24          [2]      "Dkt." refers to the documents in this Court's file.  "ROA I" refers to the
25  Record on Appeal prepared by the Pima County Superior Court for Petitioner's direct appeal
    to the Arizona Supreme Court (Case No. CR-89-0199-AP).  "ROA II" refers to the Record
26  on Appeal prepared by the Pima County Superior Court for Petitioner's petition for review
    to the Arizona Supreme Court from the denial of PCR relief (Case No. CR-96-0699-PC).
27  "RT" refers to the reporter's transcript.  Certified copies of these records as well as the
28  original trial transcripts and appellate briefs were provided to this Court by the Arizona
    Supreme Court in April 2000.  (Dkt. 64.)

**BACKGROUND**

The Arizona Supreme Court summarized the facts surrounding the crime and Petitioner's arrest and conviction as follows:

> On March 28, 1988, Pima County Sheriffs from Tucson found a 1983 Porsche 944, which had been burned and abandoned. Officials determined that the Porsche belonged to Frank and Lili Champagne. A deputy went to inform the Champagnes and discovered the bodies of Lili Champagne (Lili) and her daughter, Mindy Peters (Mindy). Lili had been shot once behind the left knee and once between the eyes. Mindy had been shot twice, once in the jaw and once behind the ear.

> Following a news bulletin asking for information regarding the victims or the Porsche, defendant's sister notified homicide detectives that defendant knew something about the incident. Detectives picked up defendant at his sister's house. Defendant told detectives that he had met a man named "Red" at a 7-Eleven, and that Red had given both defendant and Chris Lincoln (codefendant) a ride in a white Porsche. After driving around town, Red went to a Tucson address to visit his girlfriend. According to defendant, Red told him to take the car and put gas in it. Defendant and codefendant rode around town for about an hour before returning to pick up Red. Red took them home, but returned a short time later to borrow a gas can.

> The detectives had defendant retrace his trip with Red before taking him to the police station for questioning. In doing so, they went to the victims' residence. Defendant and codefendant were questioned separately, and codefendant confessed to the theft and arson of the Porsche and implicated defendant. During further questioning, codefendant confessed to participating in the killings and again implicated defendant. Both were arrested and charged with the murders of Lili and Mindy.

> A search of defendant's trailer produced a set of keys fitting the Porsche. A search of codefendant's trailer produced ammunition identical to that used in the homicides and a portable stereo belonging to the victims. Detectives searched a neighbor's storage shed, which codefendant used, and found stereo equipment, gloves, a jacket and the murder weapon, a .22 caliber bolt action rifle with a loaded magazine. Defendant's fingerprint was found on the stock of the rifle and also on the driver's side of the Porsche.

> Defendant was placed in a cell with Anthony Schmanski. Schmanski testified that when he asked defendant why he was in jail, defendant answered, "Well, I just blew two people away." When asked why, defendant responded "they had seen his face." Schmanski notified authorities because defendant did not show "any remorse" and acted "nonchalant" about killing the victims.

> Further investigation revealed that on the morning of 28 March 1988, defendant attempted to sell the victims' car stereo to Brian Mize, a coworker. Mize testified that defendant said he and a friend went to the victims' house, made sure that Lili and Mindy were in the same room, and entered through the garage. Defendant told Mize that after taking "some stuff" from the house, he

sent codefendant out and then shot the victims. Defendant said that "after he shot the older lady that . . . her body rolled over and blood gushed out of her head." According to Mize, defendant acted as if the murders were "just like something he would do on a weekend." Mize also testified that defendant said he planned on going up to the house for two weeks and that he knew the girl and where she lived. Defendant also told Mize that he had taken a VCR and the Porsche and had later "torched" the car.

Mindy's friend, Linda Smolic, testified that defendant knew the victims. Defendant met Mindy and Linda around Christmas 1987 at a local Jack-in-the-Box. He drove both of the girls to his trailer and later took them home. Defendant's sister found Mindy's wallet in her car and defendant returned the wallet to Mindy's mother at her house. A couple of months later, defendant drove Mindy and Linda to a party. According to Linda, this was the last time Mindy had any contact with defendant.

After a four day trial, the jury returned guilty verdicts on all counts. At sentencing, the judge found three aggravating factors as to each first degree murder conviction: (1) that the murders had been committed for pecuniary gain, A.R.S. § 13-703(F)(5); (2) that the murders were especially heinous, cruel or depraved, A.R.S. § 13-703(F)(6); and (3) that defendant had been convicted of one or more homicides, which were committed during the commission of the offense, A.R.S. § 13-703(F)(8). The judge found defendant's age, 19 at the time of the killings, to be the only statutory mitigating factor. After considering all of defendant's proffered mitigating factors and finding them insubstantial to call for leniency, the trial court sentenced defendant to death on each of the first degree murder counts. Additionally, the court sentenced defendant to 21 years each for first degree burglary and armed robbery, 10 years for the theft by control and 5 years for arson of an unoccupied structure, the Porsche. All non-murder counts were to run consecutively to the death sentences and each other.

*State v. Greenway*, 170 Ariz. 155, 158, 823 P.2d 22, 25 (1991). On direct appeal, the Arizona Supreme Court affirmed. *Id.* Petitioner did not seek certiorari to the United States Supreme Court.

In January 1998, following unsuccessful state post-conviction-relief (PCR) proceedings, Petitioner's state PCR attorney filed a Petition for Writ of Habeas Corpus in this Court. (Dkt. 1.) The Court issued a stay of execution, appointed state PCR counsel as counsel in these proceedings, and provided several months to file an amended petition. (Dkt. 11.) On July 7, 1998, Petitioner filed a pleading entitled, "Notice of Not Filing an Amended Petition." (Dkt. 45.) Respondents filed an answer to the initial petition, limited by the Court's order to issues of exhaustion and procedural default. (Dkt. 46.) Petitioner filed a

traverse, Respondents filed a reply, and Petitioner filed a sur-reply.  (Dkts. 47, 49, 50.)  On July 2, 1999, with no opposition by Respondents, the Court allowed amendment of the petition to add one claim.  (Dkt. 59.)  Petitioner filed an amended petition and supporting memorandum on July 22, 1999.  (Dkts. 61, 62.)

On July 27, 2000, United States District Court Judge William D. Browning issued an order finding the majority of Petitioner's claims to be procedurally barred, plainly meritless, not cognizable, or premature.[3]  (Dkt. 65.)  Merits briefing on the remaining claims – Claims A, B, and D-5 – was completed in June 2001.  (Dkts. 78, 89, 96.)  One year later, following the Supreme Court's decision in *Atkins v. Virginia*, 536 U.S. 304 (2002) (holding that the Eighth Amendment prohibits execution of mentally retarded individuals), and *Ring v. Arizona*, 536 U.S. 584 (2002) (finding unconstitutional Arizona's statute that allowed a sentencing judge, sitting without a jury, to determine the existence of aggravating factors necessary for imposition of the death penalty), the Court stayed Petitioner's sentencing-related claims pending exhaustion in state court of new claims based on these cases.  (Dkt. 103.)

Petitioner filed a successive PCR petition under Arizona's Rule 32, asserting that he was mentally retarded or was entitled to a new sentencing under *Ring*.  Subsequently, both the Arizona Supreme Court and the United States Supreme Court ruled that *Ring* does not apply retroactively to cases such as Petitioner's that were final at the time of the *Ring* decision.  *Schriro v. Summerlin*, 542 U.S. 348 (2004); *State v. Towery*, 204 Ariz. 386, 64 P.3d 828 (2003).  In addition, Petitioner's expert concluded that Petitioner did not meet the criteria for mental retardation.  (PR doc. 15, Ex. 1 at 3.)[4]  Consequently, Petitioner sought and

---

[3]     This case was reassigned to the undersigned judge on February 10, 2005.  (Dkt. 121.)

[4]     "PR doc." refers to the documents filed in the Arizona Supreme Court relating to Petitioner's Petition for Review from the denial of relief in his second PCR proceeding (Case No. CR-06-0026-PC).  A certified copy of this record was provided to this Court by

was granted permission to file an amended PCR petition that raised the following claims: (1) newly-discovered psychological evidence under Rule 32.1(e) mandates reconsideration of the death sentence; (2) innocence of the death penalty under Rule 32.1(h) mandates reversal of the death sentence; (3) change in the law based on *Blakely v. Washington* mandates a new sentencing hearing before a jury under Rule 32.1(g); (4) change in the law based on *Wiggins v. Smith,* 539 U.S. 510 (2003), mandates a new sentencing proceeding with constitutionally effective counsel; and (5) cumulative effect of counsel's errors at sentencing requires relief.  (PR doc. 11, Ex. D1 at 7-37.)  He later sought amendment to add a claim based on *Roper v. Simmons*, 543 U.S. 551 (2005), asserting that *Roper* should be extended to bar execution of prisoners who are functionally, not just chronologically, under age 18 at the time of the crime.  (PR doc. 15, Ex. 4.)

The PCR court denied the request to add a *Roper* claim, finding it inapplicable to persons such as Petitioner who were chronologically over age 18 when the crime occurred. (PR doc. 11, Ex. A at 6.)  The court further concluded that the claims raised in Petitioner's amended successive PCR petition failed to meet the criteria for an exception to preclusion based on either newly-discovered evidence, change in the law, or actual innocence under Arizona's Rules 32.1(e), (g), and (h).  (*Id.* at 5-6.)  In a detailed ruling, the court dismissed the petition without holding an evidentiary hearing.  (*Id.* at 6.)  The Arizona Supreme Court summarily denied a petition for review of the PCR court's dismissal.  (PR doc. 19.) Thereafter, this Court lifted the stay of proceedings and set a briefing schedule for the pending amendment motion.  (Dkt. 132.)

## MOTION TO AMEND

A petition for habeas corpus may be amended pursuant to the Federal Rules of Civil Procedure.  28 U.S.C. § 2242; *see also* Rule 11, Rules Governing § 2254 Cases, 28 U.S.C. foll. § 2254 (providing that the Federal Rules of Civil Procedure may be applied to habeas

---

the Arizona Supreme Court in March 2007.  (Dkt. 148.)

1   petitions to the extent the rules are not inconsistent with the habeas rules).  Thus, the Court

2   looks to Rule 15 of the Federal Rules of Civil Procedure to address a party's motion to

3   amend a pleading in a habeas corpus action.  *See Calderon v. United States Dist. Ct. for the*

4   *N. Dist. of Cal.*, 134 F.3d 981, 986 n.6 (9th Cir. 1998) (citing *Withrow v. Williams*, 507 U.S.

5   680, 696 n.7 (1993)).  Under Rule 15(a), leave to amend "shall be freely given when justice

6   so requires," and courts must review motions to amend "in light of the strong policy

7   permitting amendment."  *Gabrielson v. Montgomery Ward & Co.*, 785 F.2d 762, 765 (9th

8   Cir. 1986).  The factors which may justify denying a motion to amend are undue delay, bad

9   faith or dilatory motive, futility of amendment, and undue prejudice to the opposing party.

10  *Foman v. Davis*, 371 U.S. 178, 182 (1962).  Leave to amend may be denied based upon

11  futility alone.  *See Bonin v. Calderon*, 59 F.3d 815, 845 (9th Cir. 1995).

12          Petitioner seeks to add numerous new claims to his petition and to amend his existing

13  ineffectiveness claims with allegations and evidence presented for the first time in his

14  successive PCR proceeding. The latter request is addressed separately below in conjunction

15  with the Court's discussion of the merits of Claim A.

16  **Newly-Discovered Evidence**

17          Petitioner seeks to add a claim alleging that the state PCR court misapplied established

18  United States Supreme Court law and relied on flawed facts when it determined that

19  Petitioner failed to meet the criteria for newly-discovered evidence under Rule 32.1(e) of the

20  Arizona Rules of Criminal Procedure. (Dkt. 139 at 40.) Specifically, he asserts that the state

21  court erred in determining that new psychological mitigating evidence would not have

22  affected the sentencing decision. (*Id.* at 41-42.)

23          Petitioner's "claim" is premised on error by the state PCR court for not granting post-

24  conviction relief under Arizona's Rule 32.1(e), which provides for relief where "[n]ewly-

25  discovered material facts probably exist and such facts probably would have changed the

26  verdict or sentence." Ariz. R. Crim. P. 32.1(e).  However, the Ninth Circuit has clarified that

27

28

procedural errors arising during PCR proceedings are not cognizable in habeas corpus proceedings under 28 U.S.C. § 2254 because they do not challenge a petitioner's detention. *Franzen v. Brinkman*, 877 F.2d 26, 26 (9th Cir. 1989) (per curiam); *see also Ortiz v. Stewart*, 149 F.3d 923, 939 (9th Cir. 1998); *Gerlaugh v. Stewart*, 129 F.3d 1027, 1045 (9th Cir. 1997).

Further, Petitioner's claim makes clear that he is not actually alleging a procedural error; rather, he contends that the state court wrongly decided the substance of his state-law claim. Erroneous application of substantive state law is not reviewable in a federal habeas corpus proceeding. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991).

Finally, to the extent Petitioner is asserting a free-standing claim of innocence of the death penalty, such a claim is not cognizable in a federal habeas proceeding. *Cf. Herrera v. Collins*, 506 U.S. 390, 417 (1993) (assuming without deciding that if a free-standing claim of innocence is cognizable for habeas relief, it would be a claim of "actual innocence" of the *crime* with an extremely high standard of proof); *Carriger v. Stewart*, 132 F.3d 463, 476-77 (9th Cir. 1997) (holding that, if recognized, a free-standing innocence claim would require proof that the defendant is innocent of the *crime*). Innocence of the death penalty, if it amounts to a "fundamental miscarriage of justice," has been recognized as a gateway through which an otherwise barred claim may be heard, *Sawyer v. Whitley*, 505 U.S. 333, 336 (1992), but there is no support for Petitioner's assertion that innocence of the death penalty is a stand-alone claim for federal habeas relief. Accordingly, it would be futile to allow amendment of this claim because it does not present a cognizable claim for federal habeas corpus relief.[5]

---

[5]    Secondarily, as Respondents correctly assert, the state court found this claim precluded because it did not meet any of Arizona's exceptions to preclusion for a claim presented in a successive PCR petition. *See* Ariz. R. Crim. P. 32.2(b). Because the claim is also procedurally defaulted, amendment is not appropriate. *Lopez v. Schriro*, 491 F.3d 1029, 1042-43 (9th Cir. 2007) (upholding denial of amendment where state court found precluded a claim raised for first time in successive state PCR petition and necessarily concluded that the claim failed to meet an exception to preclusion under Arizona's Rule 32.2(b)).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Innocence of the Death Penalty**

Petitioner alleges that the state PCR court unconstitutionally applied Arizona's Rule 32 in finding that he had failed to establish a claim of actual innocence under Rule 32.1(h). (Dkt. 139 at 44.) Established in December 2000, subsection (h) provides a new avenue of relief from a death sentence if "[t]he defendant demonstrates by clear and convincing evidence that the facts underlying the claim would be sufficient to establish . . . that the court would not have imposed the death penalty." Ariz. R. Crim. P. 32.1(h); *Lopez v. Schriro*, 491 F.3d 1029, 1042 (9th Cir. 2007). Like newly-discovered evidence under Rule 32.1(e), claims that meet the requirements of Rule 32.1(h) are exempt from the rule of preclusion for successive petitions. Ariz. R. Crim. P. 32.2(b).

Petitioner asserts there is a dearth of state caselaw interpreting and applying subsection (h) and that the state court applied too high a standard in his case, thus prohibiting him from gaining state post-conviction relief on this preclusion exception. (*Id.* at 45.) As with his claim of newly-discovered evidence, Petitioner seeks to add a habeas claim based on state post-conviction error, erroneous application of state law, and innocence of the death penalty as a free-standing claim. None set forth a ground for federal habeas relief; therefore, amendment is futile. *Franzen*, 877 F.2d at 26; *Estelle*, 502 U.S. at 67-68.

**Application of *Roper v. Simmons***

Petitioner seeks to add a claim that the Eighth Amendment prohibits capital punishment for one who is functionally under age 18 at the time of the crime, regardless of chronological age. (Dkt. 139 at 47-48.) The Court concludes that amendment to add this claim is futile.

First, the claim is procedurally defaulted. Petitioner sought leave to amend his PCR petition to add the claim, but this request was denied. (PR doc. 11, Ex. A at 6.) Thus, it was not exhausted in a procedurally appropriate manner. *O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999) (stating that to protect the integrity of the federal exhaustion rule, "we ask not

only whether a prisoner has exhausted his state remedies, but also whether he has *properly* exhausted those remedies"). Second, the claim is plainly meritless. The Supreme Court's *Roper* decision is expressly limited to chronological age; the Court never indicated that functionality is an element of determining age. *Roper*, 543 U.S. at 574 ("The age of 18 is the point where society draws the line for many purposes between childhood and adulthood. It is, we conclude, the age at which the line for death eligibility ought to rest."). Petitioner does not dispute that he was 19 years old at the time of the crime. *See Greenway*, 170 Ariz. at 169, 823 P.2d at 36.

**Mental Retardation**

Although not entirely clear, it appears that Petitioner seeks to "preserve" a claim of mental retardation under *Atkins v. Virginia* in the event future evidence to support such a claim is uncovered. Petitioner withdrew his *Atkins* claim from consideration by the PCR court after his expert determined there was insufficient evidence to satisfy the legal standard for mental retardation (PR doc. 15, Ex. 1 at 3), and he did not further pursue any *Atkins*-related relief in his petition for review to the Arizona Supreme Court (PR doc. 3). It is self evident that amendment to include a "potential" claim that was not properly exhausted in state court is futile.

**Conclusion**

Because it would be futile to amend Petitioner's first amended petition to add non-cognizable or plainly meritless claims, Petitioner's motion to amend to add claims based on newly-discovered evidence, actual innocence, *Roper v. Simmons*, and mental retardation is denied. The Court turns now to a discussion of the merits of Petitioner's remaining claims, as well as his requests to amend Claim A and for an evidentiary hearing.

**AEDPA STANDARD FOR HABEAS RELIEF**

Under the Antiterrorism and Effective Death Penalty Act (AEDPA), a petitioner is not entitled to habeas relief on any claim "adjudicated on the merits" by the state court unless

that adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  The phrase "adjudicated on the merits" refers to a decision resolving a party's claim which is based on the substance of the claim rather than on a procedural or other non-substantive ground. *Lambert v. Blodgett*, 393 F.3d 943, 969 (9th Cir. 2004).  The relevant state court decision is the last reasoned state decision regarding the claim. *Barker v. Fleming*, 423 F.3d 1085, 1091 (9th Cir. 2005) (citing *Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991)); *Insyxiengmay v. Morgan*, 403 F.3d 657, 664 (9th Cir. 2005).

"The threshold question under AEDPA is whether [petitioner] seeks to apply a rule of law that was clearly established at the time his state-court conviction became final." *Williams v. Taylor*, 529 U.S. 362, 390 (2000).  Therefore, to assess a claim under subsection (d)(1), the Court must first identify the "clearly established Federal law," if any, that governs the sufficiency of the claims on habeas review.  "Clearly established" federal law consists of the holding of the Supreme Court at the time the petitioner's state court conviction became final. *Williams*, 529 U.S. at 365; *see Carey v. Musladin*, 127 S. Ct. 649 (2006); *Clark v. Murphy*, 331 F.3d 1062, 1069 (9th Cir. 2003).  Habeas relief cannot be granted if the Supreme Court has not "broken sufficient legal ground" on a constitutional principle advanced by a petitioner, even if lower federal courts have decided the issue. *Williams*, 529 U.S. at 381.  Nevertheless, while only Supreme Court authority is binding, circuit court precedent may be "persuasive" in determining what law is clearly established and whether a state court applied that law unreasonably. *Clark*, 331 F.3d at 1069.

The Supreme Court has provided guidance in applying each prong of § 2254(d)(1).  The Court has explained that a state court decision is "contrary to" the Supreme Court's clearly established precedents if the decision applies a rule that contradicts the governing law

set forth in those precedents, thereby reaching a conclusion opposite to that reached by the Supreme Court on a matter of law, or if it confronts a set of facts that is materially indistinguishable from a decision of the Supreme Court but reaches a different result. *Williams*, 529 U.S. at 405-06; *see Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam).  In characterizing the claims subject to analysis under the "contrary to" prong, the Court has observed that "a run-of-the-mill state-court decision applying the correct legal rule to the facts of the prisoner's case would not fit comfortably within § 2254(d)(1)'s 'contrary to' clause."  *Williams*, 529 U.S. at 406; *Lambert*, 393 F.3d at 974.

Under the "unreasonable application" prong of § 2254(d)(1), a federal habeas court may grant relief where a state court "identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular . . . case" or "unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply."  *Williams*, 529 U.S. at 407.  In order for a federal court to find a state court's application of Supreme Court precedent "unreasonable" under § 2254(d)(1), the petitioner must show that the state court's decision was not merely incorrect or erroneous, but "objectively unreasonable."  *Id*. at 409; *Woodford v. Visciotti*, 537 U.S. 19, 25 (2002) (per curiam).

Under the standard set forth in § 2254(d)(2), habeas relief is available only if the state court decision was based upon an unreasonable determination of the facts.  *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005) (*Miller-El II*).  A state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding."  *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003) (*Miller-El I*); *see Taylor v. Maddox*, 366 F.3d 992, 999 (9th Cir. 2004).  In considering a challenge under § 2254(d)(2), state court factual determinations are presumed to be correct, and a petitioner bears the "burden of rebutting this presumption by

clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *Miller-El II*, 545 U.S. at 240. However, it is only the state court's factual findings, not its ultimate decision, that are subject to 2254(e)(1)'s presumption of correctness. *Miller-El I*, 537 U.S. at 341-42. ("The clear and convincing evidence standard is found in § 2254(e)(1), but that subsection pertains only to state-court determinations of factual issues, rather than decisions.").

As the Ninth Circuit has noted, application of the foregoing standards presents difficulties when the state court decided the merits of a claim without providing its rationale. *See Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003); *Pirtle v. Morgan*, 313 F.3d 1160, 1167 (9th Cir. 2002); *Delgado v. Lewis*, 223 F.3d 976, 981-82 (9th Cir. 2000). In those circumstances, a federal court independently reviews the record to assess whether the state court decision was objectively unreasonable under controlling federal law. *Himes*, 336 F.3d at 853; *Pirtle*, 313 F.3d at 1167. Although the record is reviewed independently, a federal court nevertheless defers to the state court's ultimate decision. *Pirtle*, 313 F.3d at 1167 (citing *Delgado*, 223 F.3d at 981-82); *see also Himes*, 336 F.3d at 853. Only when a state court did not decide the merits of a properly raised claim will the claim be reviewed de novo, because in that circumstance "there is no state court decision on [the] issue to which to accord deference." *Pirtle*, 313 F.3d at 1167; *see also Menendez v. Terhune*, 422 F.3d 1012, 1025-26 (9th Cir. 2005); *Nulph v. Cook*, 333 F.3d 1052, 1056-57 (9th Cir. 2003).

## CLAIMS DISCUSSION

### Claim A:  Ineffective Assistance of Counsel at Sentencing

#### A.      Exhaustion

In his amended petition, Petitioner raised several instances of ineffective assistance of counsel (IAC) at sentencing. Specifically, he alleged that counsel failed to:

> (1)    Obtain testimony during the sentencing phase from Dr. Ronald David, a psychiatrist who evaluated Petitioner prior to trial;

> (2)    Provide Dr. Harry Saslow, a defense psychological expert who testified at sentencing, with Petitioner's family, social, or educational history and properly prepare Dr. Saslow's testimony;

- 12 -

(3)     Properly prepare lay witness testimony (e.g., Petitioner's sister testified "mostly of how *she* was abused and little reference to Petitioner's childhood. No connection or explanation that would mitigate the sentence was provided, although it existed"); and

(4)     Conduct a full and complete investigation of Petitioner and his family, including abuse, medical history, drug usage, chaotic upbringing, learning disabilities, and non-violent history.

(Dkt. 62 at 18-21.)  In his supplemental merits brief, Petitioner expanded on his claims, contending that counsel failed to interview Petitioner's mother before she testified at sentencing.  (Dkt. 78 at 18.)  Had counsel conducted such an interview, Petitioner argued, he would have learned that Petitioner's parents were diabetic, that Petitioner twice had high fevers as a child, and that all three of his mother's children were born "extremely and unhealthily large."  (*Id.* at 18-19.)  He further alleged counsel failed to discover that Petitioner's half-siblings had "serious problems in relating to others," including an allegation of child molestation against his half-brother, and that both were married multiple times.  (*Id.*)

In its order regarding the procedural status of Petitioner's claims, the Court determined that the only IAC claims appropriate for consideration on the merits were "the allegations concerning counsel's effectiveness at sentencing *which were fairly presented in Petitioner's Rule 32 petition.*"  (Dkt. 65 at 14; emphasis added).  In his first state PCR petition, Petitioner raised a general claim of IAC at sentencing based on counsel's "failure to investigate and present adequate mitigating evidence surrounding [Petitioner's] background, family relationships and cultural anomalies which impacted on his adult behavior, resulting in substantial prejudice."  (Dkt. 90, Ex. A at 3.)  He did not, however, set forth any specific facts to support the claim – i.e., he did not identify what evidence counsel should have found and presented with respect to Petitioner's "background, family relationships and cultural anomalies."  (*Id.*)  Rather, the petition focused on the inadequacy of Dr. Saslow's testimony and counsel's failure to call Dr. David as a witness to "humanize" Petitioner.  (*Id.* at 3-6.)

Respondents contend that, pursuant to the Court's July 2000 order, the only IAC-

sentencing claims that were properly exhausted in state court are those regarding Drs. Saslow and David.  (Dkt. 89 at 6-8.)  The remaining allegations concerning lay witnesses and inadequate investigation are, Respondents assert, not appropriate for review by this Court because Petitioner did not fairly present their factual basis in state court.  (*Id.* at 8.)  The Court agrees.

Under 28 U.S.C. § 2254(b)(1), a federal habeas petitioner must fully exhaust remedies available in state court before proceeding to federal court.  To properly exhaust state remedies, the petitioner must "fairly present" his claims to the state's highest court in a procedurally appropriate manner.  *O'Sullivan v. Boerckel*, 526 U.S. at 848.  A claim is fairly presented if the petitioner has described the operative facts and legal theories on which his claim is based.  *Anderson v. Harless*, 459 U.S. 4, 6 (1982); *Picard v. O'Connor*, 404 U.S. 270, 277-78 (1971).  New factual allegations that do not fundamentally alter a claim already considered by the state court may be presented for the first time in federal habeas proceedings without rendering the claim unexhausted.  *Vasquez v. Hillery*, 474 U.S. 254, 260 (1986).  However, a petitioner who failed to develop the factual basis of a claim in state court may not obtain an evidentiary hearing in federal court unless the narrow conditions of 28 U.S.C. § 2254(e)(2) are satisfied.

1.    *First PCR Proceeding*

Petitioner acknowledges in his amended petition that the only *specific* claims raised in the first PCR petition were allegations of counsel's ineffectiveness "because: 1) he waived the testimony of Dr. David, a psychiatrist who had been appointed to do a mental health evaluation of Petitioner at the *pre-trial* stage, and 2) Dr. Saslow, who did testify, was so ill-prepared that his testimony was completely disregarded."  (Dkt. 62 at 18.)  As already determined by the Court, because these two specific allegations were properly exhausted in state court, they will be addressed on the merits below.  (Dkt. 65 at 14.)

In addition to these allegations, Petitioner asserts that his newly-articulated claims

- 14 -

based on counsel's failure to investigate Petitioner's background and to properly prepare lay witnesses were also exhausted in the first PCR petition.  Petitioner argues that the PCR petition's general references to an attorney's duty to investigate and present mitigating evidence somehow exhausted the more specific claims identified for the first time in these proceedings.  (Dkt. 96 at 1-4.)  The Court concludes that the first PCR petition's general assertion that counsel failed to investigate and present mitigation evidence, without recitation of any specific facts relevant to Petitioner's case, did not constitute fair presentation. Petitioner's newly-articulated factual allegations concerning counsel's failure to investigate Petitioner's medical and family background (e.g., interviewing his mother)[6] and properly prepare lay witnesses (e.g., his mother and sister) raised for the first time in these proceedings significantly differ from the vague, conclusory "failure to investigate" theory presented to the state court in the first PCR petition.  *See Aiken v. Spalding*, 841 F.2d 881, 883-84 & n.3 (9th Cir. 1988); *see also Kunkle v. Dretke*, 352 F.3d 980, 986 (5th Cir. 2003) (finding that significant evidentiary support not previously presented in state court fundamentally altered conclusory allegation of ineffectiveness raised in state court). Accordingly, for the reasons set forth in the Court's July 2000 order, these allegations are procedurally barred.[7]  (Dkt. 65 at 8-14.)

---

[6]       As an aside, the Court notes that Petitioner has included in the numerous materials appended to his amended petition and merits briefs, notes from a defense investigator indicating that he interviewed Petitioner's mother prior to trial. (Dkt. 97, Ex. E.) Petitioner does not assert that sentencing counsel was unaware of this interview.

[7]       Although the Court also found barred all of Petitioner's allegations of ineffectiveness at trial (Dkt. 65 at 14), Petitioner nonetheless argues extensively in his merits briefs about trial counsel's performance.  In particular, he criticizes counsel's failure to present a "mental health" defense to show that Petitioner was incapable of understanding how his actions would result in harm to others and that Petitioner suffered "from a mental disease or defect that caused him to act out in an uncontrollable way."  (Dkt. 96 at 21-22.)

Arizona has long rejected the affirmative defense of diminished capacity.  *State v. Mott*, 187 Ariz. 536, 540-41, 931 P.2d 1046, 1050-51 (1997) (citing *State v. Schantz*, 98 Ariz. 200, 212-13, 403 P.2d 521, 529 (1965)).  The practical effect of this rule is that a defendant

2.     *Second PCR Petition*

In his second PCR petition, filed after the Court's July 2000 order, Petitioner raised a new theory of ineffectiveness: there were "red flags [of mental impairment] that counsel should have noticed and investigated." (PR doc. 11, Ex. D1 at 32.) In support, he proffered new expert evidence supporting diagnoses of Left Frontal Lobe Disorder and Pervasive Developmental Disorder-Not Otherwise Specified. (Dkt. 139 at 5.) It is unclear from the pending motion to amend whether Petitioner seeks amendment to add this specific new allegation.[8] To the extent that he does, the Court finds that amendment would be futile because the claim was not properly exhausted.

---

cannot, during trial, present evidence of mental disease or defect to show that he was *incapable* of forming a requisite mental state for a charged offense. *Mott*, 187 Ariz. at 540, 931 P.2d at 1050; *Schantz*, 98 Ariz. at 213, 403 P.2d at 529; *Clark v. Arizona*, 126 S. Ct. 2709, 2737 (2006) (upholding the constitutionality of the *Mott* rule and finding that the exclusion of expert testimony regarding diminished capacity does not violate due process).

Arizona law does permit a defendant to present evidence to show that he has a *character trait* for acting reflexively, rather than reflectively, for the purpose of challenging a finding of premeditation – i.e., to show that he did not actually reflect after forming the requisite intent. *See State v. Christensen*, 129 Ariz. 32, 35-36, 628 P.2d 580, 583-84 (1981); *Vickers v. Ricketts*, 798 F.2d 369, 371 (9th Cir. 1986). However, this rule is limited in that an expert cannot testify as to whether the defendant was acting impulsively *at the time of the offense*. *Id.* at 35-36, 628 P.2d at 583-84.

[8]     The assertions in Petitioner's successive PCR petition relating to counsel's alleged failure to discover evidence of mental impairment are contradictory at best. On one hand, he faults counsel for not pursuing unidentified "red flags" that he suffered from a physical brain impairment – what he now characterizes as a frontal lobe abnormality. On the other, he asserts that a diagnosis of frontal lobe disorder was not possible at the time of his sentencing in the late 1980s because "the medical field had not yet evolved to the point it has today so it was not conceivable to have evaluated Mr. Greenway's mental health in the manner that Dr. Thompson and the other defense experts have at this time." (*Id.* at 8.) He emphasized this point again in his petition for review to the Arizona Supreme Court: "Even if Drs. David and Saslow had been provided with additional records, the neurological tests and the reading of the test results would not have been available in the form presented in this successor PCR." (PR doc. 3 at 8.)

Petitioner argued to the state PCR court that the claim was properly raised in a successive PCR petition because the United States Supreme Court's decisions in *Williams v. Taylor*, 529 U.S. at 362, and *Wiggins v. Smith*, 539 U.S. at 510, constituted a significant change in the law under Rule 32.1(g) of the Arizona Rules of Criminal Procedure; therefore, Petitioner asserted, the claim was exempt from preclusion under Rule 32.2(b). (PR doc. 11, Ex. D1 at 31.) In Petitioner's view, *Williams* and *Wiggins* mandated, for the first time, that mental health evidence and mental impairment evidence be presented by counsel at sentencing. (*Id.*)

The PCR court dismissed the claim on independent and adequate state procedural grounds. It expressly found that neither *Williams* nor *Wiggins* constituted a significant change in the law under Arizona's Rule 32.1(g). (PR doc. 11, Ex. A at 5.). It further found that Petitioner's new evidence did not meet the criteria for newly-discovered evidence under Rule 32.1(e). (*Id.*) Consequently, the claim did not qualify as an exception to preclusion under Rule 32.2(b) and was summarily dismissed on state procedural grounds. *Cf. Lopez*, 491 F.3d at 1042-43. Furthermore, in his petition for review to the Arizona Supreme Court, Petitioner did not assert ineffectiveness based on counsel's alleged failure to investigate and present evidence of mental impairment; rather he argued that the mental impairment evidence uncovered during the successive PCR proceeding met the state-law standards for newly-discovered evidence under Rule 32.1(e) and actual innocence under Rule 32.1(h). Thus, Petitioner failed to present this claim to the state's highest court as required by *Boerckel*, 526 U.S. at 848, and *Swoopes v. Sublett*, 196 F.3d 1008 (9th Cir. 1999).

Petitioner's new allegation of ineffectiveness was not properly exhausted in state court and is therefore procedurally defaulted. To the extent Petitioner contends he can establish cause and prejudice for the default, he has reasserted the same arguments already addressed by the Court in its July 2000 order. (Dkt. 65 at 10-14.) For example, Petitioner argues that his new evidence of mental impairment was not known prior to the filing of his habeas

1   petition because the State "failed to provide resources, a fair and adequate avenue to pursue

2   these new facts, competent representation, and an opportunity to be heard" during that

3   collateral proceeding.  (*Id.* at 8.) He also renews his arguments about the quality of his initial

4   PCR attorney, Sara Kaufman, asserting that he was denied due process during his first PCR

5   proceeding.  These arguments were thoroughly addressed, and rejected, by the Court in its

6   initial order regarding the procedural status of Petitioner's claims, as well as the two motions

7   for reconsideration that followed.  (Dkt. 65 at 10-14; Dkt. 73 at 2-3; Dkt. 77 at 1.)

8          With regard to the fundamental-miscarriage-of-justice exception to procedural default,

9   Petitioner asserts that the new mental impairment evidence establishes that he is actually

10  innocent of the death penalty.  As Petitioner acknowledges, to establish innocence of the

11  death penalty as a gateway, Petitioner must show by clear and convincing evidence that, but

12  for a constitutional error, no reasonable factfinder would have found the existence of any

13  aggravating circumstance or some other condition of eligibility for the death sentence under

14  the applicable state law. *Sawyer v. Whitley*, 505 U.S. 333, 336 (1992).  In Arizona, eligibility

15  for the death penalty is predicated on the existence of at least one statutory aggravating

16  factor. *See LaGrand v. Stewart*, 133 F.3d 1253, 1262 (9th Cir. 1998); *Villafuerte v. Stewart*,

17  111 F.3d 616, 629 (9th Cir. 1997).  The Court rejects Petitioner's attempt to demonstrate, via

18  new mitigation evidence, that no reasonable factfinder would have found at least one of the

19  three aggravating factors at issue in this case. *See Sawyer*, 505 U.S. at 347 (focus is on

20  eligibility, not on additional mitigation); *LaGrand*, 133 F.3d at 1262 ("actual innocence of

21  the death penalty must focus on eligibility for the death penalty, and not on additional

22  mitigation"); *Villafuerte*, 111 F.3d at 629.  For that reason, Petitioner cannot establish a

23  fundamental miscarriage of justice based on innocence of the death penalty.

24  **B.     Evidentiary Development**

25         Petitioner's motion to amend also requests that the Court consider the new mental

26  health evidence developed in the second state PCR proceeding to support his "pending

27

28

- 18 -

ineffective claim." (Dkt. 139 at 47.) Petitioner further requests, in both his merits briefs and the motion to amend, that this Court hold an evidentiary hearing because he "has not had an opportunity to develop his claims." (*Id.* at 55; Dkt. 96 at 4-8.)

       1.   *Legal Standards*

Historically, a federal habeas court had considerable discretion to hold an evidentiary hearing to resolve disputed issues of material fact. *See Townsend v. Sain*, 372 U.S. 293, 312, 318 (1963), *overruled in part by Keeney v. Tamayo-Reyes*, 504 U.S. 1 (1992), *and limited by* 28 U.S.C. § 2254 (e)(2); *Baja v. Ducharme*, 187 F.3d 1075, 1077-78 (9th Cir. 1999); Rule 8, Rules Governing § 2254 Cases, 28 U.S.C. foll. § 2254 (providing that the district court judge shall determine if an evidentiary hearing is required). That discretion is significantly circumscribed by § 2254(e)(2) of the AEDPA. *See Baja*, 187 F.3d at 1077-78.

Section 2254 provides in relevant part:

> *If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that --*

    (A) the claim relies on --

> > (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or

> > (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and

    (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2254(e)(2) (emphasis added). These provisions apply equally when a petitioner seeks to expand the record under Rule 7 to establish the factual predicate of a claim. *Cooper-Smith v. Palmateer*, 397 F.3d 1236, 1241 (9th Cir. 2005) (holding that the conditions of § 2254(e)(2) generally apply to petitioners seeking relief based on new evidence, even when they do not seek an evidentiary hearing) (citing *Holland v. Jackson*, 542 U.S. 649, 652-53 (2004) (per curiam)).

The Supreme Court has interpreted subsection (e)(2) as precluding an evidentiary hearing in federal court if the failure to develop a claim's factual basis is due to a "lack of diligence, or some greater fault, attributable to the prisoner or prisoner's counsel." *Williams (Michael) v. Taylor*, 529 U.S. 420, 432 (2000).  The diligence assessment is an objective one, requiring a determination of whether a petitioner "made a reasonable attempt, in light of the information available at the time, to investigate and pursue claims in state court." *Id.* at 435. For example, when there is information in the record that would alert a reasonable attorney to the existence and importance of certain evidence, the attorney fails to develop the factual record if he does not make reasonable efforts to sufficiently investigate and present evidence to the state court.  *See id.* at 438-39, 442; *Alley v. Bell*, 307 F.3d 380, 390-91 (6th Cir. 2002) (lack of diligence because petitioner knew of and raised the claims in state court, but failed to investigate all the factual grounds for such claims).

Absent unusual circumstances, diligence requires that a petitioner "at a minimum, seek an evidentiary hearing in state court in the manner prescribed by state law." *Williams*, 529 U.S. at 437; *see Bragg v. Galaza*, 242 F.3d 1082, 1090 (9th Cir.) (finding no diligence because petitioner neither requested an evidentiary hearing in the trial court nor filed a state habeas petition), *amended on denial of reh'g*, 253 F.3d 1150 (9th Cir. 2001).  The mere request for an evidentiary hearing, however, may not be sufficient to establish diligence if a reasonable person would have taken additional steps.  *See Dowthitt v. Johnson*, 230 F.3d 733, 758 (5th Cir. 2000) (observing that counsel failed to present affidavits of family members that were easily obtained without court order and with minimal expense); *see also McNair v. Campbell*, 416 F.3d 1291, 1299-1300 (11th Cir. 2005) (observing that there had been neither development of evidence otherwise available though petitioner, family members, and medical literature, nor appeal of denial of funds and hearing); *Cannon v. Mullin*, 383 F.3d 1152, 1177 (10th Cir. 2004) (stating that a petitioner is not diligent if he failed to proffer "evidence that would be readily available if the claim were true"); *Koste v.*

1 *Dormire*, 345 F.3d 974, 985-86 (8th Cir. 2003) (finding no effort to develop the record or

2 assert any facts to support claim).

3          2.    *Analysis*

4          With respect to Petitioner's request that the Court consider the new evidence

5 developed during the second PCR proceeding, the Court finds that such evidence is irrelevant

6 to resolution of Petitioner's properly exhausted IAC claims.  All of the exhibits proffered by

7 Petitioner to the state court during the successive PCR proceeding relate solely to his claim

8 of Left Frontal Lobe Disorder and Pervasive Developmental Disorder as newly-discovered

9 medical diagnoses establishing brain dysfunction.  (PR doc. 12, Exs. L, N; PR doc. 13, Exs.

10 P-R, T-U.)  These diagnoses were based, in large part, on extensive neurological testing,

11 including an EEG and qEEG. As Petitioner himself acknowledges, however, these tests were

12 not available "to be presented in the same manner at the time of sentencing."  (Dkt. 139 at

13 25-26; *see also* PR doc. 3 at 8.)  Dr. Thomas Thompson, who examined Petitioner during the

14 second PCR proceedings, states that the significance of Drs. David's and Saslow's findings

15 to a diagnosis of impaired brain development can only be appreciated today in light of the

16 integration of neuroscience and neuropsychology that did not "fully emerge until the 1990s-

17 2000s."  (PR doc. 12, Ex. L3 at 5-6.)  Consequently, this Court finds that Petitioner's

18 proffered evidence concerning his newly-discovered frontal lobe abnormalities is not relevant

19 to the pending IAC claims challenging counsel's failure to utilize the available testimony of

20 Dr. David and to properly prepare the testifying expert, Dr. Saslow.  Expansion of the record

21 to include this new medical evidence is not warranted, and Petitioner's request to amend for

22 this purpose is denied.

23          With regard to his request for an evidentiary hearing, Petitioner fails to articulate in

24 either his merits brief or motion to amend what evidence would be presented at such a

25 hearing.  He simply states summarily that a hearing is needed to evaluate the mitigation

26 evidence that was not presented at sentencing.  (Dkt. 96 at 8; *see also* Dkt. 139 at 55.)

27

28

1   Regardless, as explained next, Petitioner's lack of diligence in state court forecloses a

2   hearing in federal court.

3              (a).    Background

4              Petitioner was initially represented in his first state PCR proceeding by court-

5   appointed counsel, Sara Kaufman.  Kaufman successfully moved for appointment of an

6   investigator (ROA II at 42-50), but did not request any expert assistance to prepare the PCR

7   petition.  Counsel ultimately filed an eight-page PCR petition that raised only the IAC-

8   sentencing claims now pending before this Court.  (*Id*. at 51-59, 63-65.)  Counsel did not

9   attach any supporting materials to the petition.  As already noted, the petition contained scant

10  specific factual allegations and generically requested "an evidentiary hearing . . . in order to

11  present testimony on which this court can base an informed decision."  (*Id*. at 59.)  In a reply

12  brief, Petitioner reiterated his request for a hearing, specifically on the question of counsel's

13  failure to call Dr. David to testify:

14
15              Counsel respectfully requests that this Court hold a hearing regarding the
              testimony which Dr. David would have presented had he been allowed to
16              testify.  At the hearing, Dr. David would be called to testify and would provide
              this Court with facts regarding Mr. Greenway's state of mind at the
17              commission of the offenses.  This Court would then be fully informed and
              better able to formulate an opinion as to the appropriate sentence under the
18              circumstances.

18  (*Id*. at 134.)

19
20              In August 1993, concerned that Kaufman was not adequately communicating with him

21  about his case, Petitioner moved *pro per* for a change of counsel.  (*Id*. at 117-20.)  The record

22  does not reveal whether the court ever ruled on Petitioner's motion.  In January 1994, the

23  court summarily denied PCR relief.  (*Id*. at 136.)  The next month, Kaufman sought

24  authorization to file a delayed motion for rehearing, stating she was unaware the Court had

25  ruled due to a mail problem following a change of offices.  (*Id*. at 138-40.)  Prior to the court

26  ruling on the motion, Petitioner moved to proceed *in propria persona*, which was granted.

27  (*Id*. at 141, 147).  The court then denied Kaufman's motion, noting that Petitioner was now

28                                              - 22 -

proceeding *pro per* and stating that Petitioner was not precluded from filing his own motion for reconsideration. (*Id.* at 148.)

In April 1994, an attorney with the Arizona Capital Representation Project (ACRP) moved for appointment as counsel and for permission to file a delayed motion for rehearing and to amend the original PCR petition, arguing that Kaufman had failed to litigate the PCR in a competent manner. (*Id.* at 167.) Following appointment of the ACRP, Petitioner moved to vacate the order summarily denying the PCR petition. (*Id.* at 254.) The motion was denied (*id.* at 272), and Petitioner sought special action relief from the Arizona Supreme Court (*id.* at 275), which declined jurisdiction of the petition "without prejudice to petitioner filing a motion for reconsideration of the denial of post-conviction relief" (*id.* at 394). Thereafter, Petitioner's motion to file a motion for rehearing *nunc pro tunc* was granted. (*Id.* at 311.)

On December 27, 1994, Petitioner moved for discovery and for change of judge for cause based on an alleged relationship between Judge Scholl and a former law-enforcement colleague with familial ties to the victims. (*Id.* at 440-41.) Following a hearing in April 1995, the presiding judge of the Pima County Superior Court granted limited discovery regarding the disqualification motion. (*Id.* at 516.) While discovery was on-going, the Arizona Supreme Court suspended Judge Scholl for an unrelated matter. Consequently, on January 4, 1996, the presiding judge denied the motion for change of judge as moot and reassigned the case to Judge Robert Donfeld. (*Id.* at 541.) Around this same time, in the wake of Congressional defunding of the ACRP, attorney Carla G. Ryan was substituted as counsel for Petitioner and provided time to familiarize herself with the record. (*Id.* at 554.)

On May 21, 1996, Ryan filed a motion for reconsideration from Judge Scholl's denial of post-conviction relief and a request for leave to reopen and amend Kaufman's Rule 32 petition. (*Id.* at 686.) Counsel also provided a supplemental list of new claims that, if permitted, would be raised in the amended petition. (*Id.* at 729.) On September 9, Judge

Donfeld ruled that, with the exception of one claim based on newly-discovered evidence (Judge Scholl's alleged conflict), the remaining claims were either precluded or waived.  In doing so, the court construed Ryan's motion as a successive PCR petition and applied the rule of preclusion set forth in Arizona's Rule 32.2(a)(3).  (*Id.* at 748-50.)  The Arizona Supreme Court summarily denied review.

(b).   Diligence

Petitioner is required to have "made a reasonable attempt, in light of the information available at the time, to investigate and pursue claims in state court."  *Williams*, 529 U.S. at 435.  If Petitioner failed in state court to present easily obtained evidence or investigate evidence of which he was aware, even an explicit hearing request will not establish diligence.  *See Dowthitt*, 230 F.3d at 758; *Koste*, 345 F.3d at 985-86.  Under Arizona law, Petitioner had a duty to file supporting affidavits, records, or other evidence available to him to support the allegations raised in his PCR petition.  Ariz. R. Crim. P. 32.5.

As noted, Petitioner's PCR counsel attached no evidence to the first PCR petition in support of the IAC claims raised therein.  Further, the record reveals that, other than an investigator, counsel did not request any resources or assistance from the court to develop these claims.  To prevail on a claim of IAC, Petitioner must show that counsel's performance was deficient, and that the deficiency prejudiced the defense.  *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984).  Based solely on the elements of the claim, it should have been clear to PCR counsel that the factual premise of these claims required, at a minimum, determining counsel's strategy or thought process in relation to his preparation of Dr. Saslow and decision not to use Dr. David at sentencing.  The other obvious step would have been for PCR counsel (or her investigator) to interview Dr. David to determine what evidence he would have added to the sentencing calculus and Dr. Saslow to determine whether additional materials regarding Petitioner's background would have affected his opinions.  In light of counsel's failure to investigate and develop the basic facts necessary to present these IAC

claims in state court, the Court finds Petitioner was not diligent.

Petitioner essentially concedes that his state post-conviction counsel did nothing to develop his claims. Instead, he argues that the lack of factual development in state court is attributable to the State because it objected to Petitioner's attempts to re-open and amend the first PCR petition after new counsel was appointed. (Dkt. 139 at 8.) He further asserts that Arizona's PCR proceedings are unfair and inadequate because they do not appoint qualified counsel or provide sufficient resources to investigate claims. (*Id.*) Finally, he argues in this case that PCR counsel Kaufman was so incompetent that Petitioner effectively received no due process during the PCR proceeding. (*Id.* at 11, 15, 21.)

Although Petitioner contends that omissions by PCR counsel in developing the facts of his claims in state court cannot be attributed to him, omissions by counsel are in fact attributable to a habeas petitioner. *See Williams,* 529 U.S. at 437-40; *Wildman v. Johnson*, 261 F.3d 832, 839-40 (9th Cir. 2001). The Court does not countenance the apparent shortcomings of PCR counsel's efforts in this capital case. However, as set forth extensively in the Court's July 2000 order addressing nearly identical arguments with regard to cause for the default of his other claims (Dkt. 65 at 11), there is no right to the effective assistance of counsel in a state post-conviction collateral proceeding. *Pennsylvania v. Finley*, 481 U.S. 551, 555 (1987); *Harris v. Vasquez*, 949 F.2d 1497, 1513-14 (9th Cir. 1990). If the alleged ineffectiveness of PCR counsel cannot serve as cause, the Court concludes that neither can it excuse a petitioner's failure to develop the facts of his claims in state court.

(c).    Conclusion

Pursuant to § 2254(e)(2), Petitioner's lack of diligence in state court prohibits this Court from granting further evidentiary development of his IAC claims, and he has not attempted to meet the statute's exceptions. Therefore, Petitioner's requests to amend his pending IAC claims to include new supporting evidence and for an evidentiary hearing are denied. This Court's review of the two IAC allegations properly before it is limited to the

factual record developed in the first state PCR proceeding.  *See Cardwell v. Netherland*, 971 F. Supp. 997, 1008 (E.D. Va. 1997), *aff'd*, *Cardwell v. Greene*, 152 F.3d 331 (4th Cir. 1998), *overruled in part on other grounds*, *Bell v. Jarvis*, 236 F.3d 149 (4th Cir. 2000) (en banc). However, even had Petitioner diligently sought to develop these claims in state court, an evidentiary hearing is not required because, as explained next, Petitioner has not alleged facts that would entitle him to relief.  *See Townsend*, 372 U.S. at 312-13.

### C.    Merits Discussion

As already noted, Petitioner raised these claims in his first PCR petition.  (Dkt. 90, Ex. A.)  The trial court summarily denied them without explanation, pursuant to Rule 32.6(c) of the Arizona Rules of Criminal Procedure.  (Dkt. 90, Ex. L.)  The Arizona Supreme Court denied review without comment.  Because the PCR court provided no rationale for its determination, on habeas review this Court reviews the record independently to assess whether the state court's decision denying relief on these claims was objectively unreasonable under clearly established federal law.  *Himes*, 336 F.3d at 853; *Pirtle*, 313 F.3d at 1167.

### 1.    *Clearly Established Law*

To prevail on an IAC claim, a petitioner must show that counsel's performance was deficient and that the deficient performance prejudiced his defense.  *Strickland*, 466 U.S. at 687-88.  The inquiry under *Strickland* is highly deferential, and "every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."  *Id.* at 689.  To prove deficient performance, a defendant must also overcome "the presumption that, under the circumstances, the challenged action might be considered sound trial strategy."  *Id.*  To demonstrate prejudice, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine

1    confidence in the outcome." *Id.* at 694.

2            Trial counsel has "a duty to make reasonable investigations or to make a reasonable

3    decision that makes particular investigations unnecessary," and "a particular decision not to

4    investigate must be directly assessed for reasonableness in all the circumstances, applying

5    a heavy measure of deference to counsel's judgments." *Hayes v. Woodford*, 301 F.3d 1054,

6    1066 (9th Cir. 2002) (quoting *Strickland*, 466 U.S. at 691).   To determine whether the

7    investigation was reasonable, the court "must conduct an objective review of [counsel's]

8    performance, measured for reasonableness under prevailing professional norms, which

9    includes a context-dependent consideration of the challenged conduct as seen from counsel's

10   perspective at the time." *Wiggins v. Smith*, 539 U.S. 510, 523 (2003) (citation and quotation

11   marks omitted).   As the Supreme Court recently reiterated, "In judging the defense's

12   investigation, as in applying *Strickland* generally, hindsight is discounted by pegging

13   adequacy to 'counsel's perspective at the time' investigative decisions are made and by

14   giving a 'heavy measure of deference to counsel's judgments.'" *Rompilla v. Beard*, 545 U.S.

15   374, 381 (2005) (quoting *Strickland*, 466 U.S. at 689, 691).

16          The right to effective assistance of counsel applies not just to the guilt phase, but

17   "with equal force at the penalty phase of a bifurcated capital trial." *Silva v. Woodford*, 279

18   F.3d 825, 836 (9th Cir. 2002) (quoting *Clabourne v. Lewis*, 64 F.3d, 1373, 1378 (9th Cir.

19   1995)).   With respect to prejudice at sentencing, the *Strickland* Court explained that "[w]hen

20   a defendant challenges a death sentence . . . the question is whether there is a reasonable

21   probability that, absent the errors, the sentencer . . . would have concluded that the balance

22   of aggravating and mitigating circumstances did not warrant death."   466 U.S. at 695.   In

23   *Wiggins*, the Court further noted that "[i]n assessing prejudice, we reweigh the evidence in

24   aggravation against the totality of available mitigating evidence."   539 U.S. at 534.   The

25   "totality of the available evidence" includes "both that adduced at trial, and the evidence

26   adduced in the habeas proceeding." *Id.* at 536 (quoting *Williams*, 529 U.S. at 397-98)).

27

28                                          - 27 -

A court need not address both components of the *Strickland* inquiry, or follow any particular order.  If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, without evaluating counsel's performance, that should be done. *Strickland*, 466 U.S. at 697.

2.    *Factual Background*

During a two-day presentence aggravation/mitigation hearing, Petitioner presented a total of eight witnesses during his case-in-chief.  These included defense investigator Robert Annenberg, a psychologist, and various acquaintances and family members.

Annenberg testified that while employed at a local resort, Petitioner successfully performed the Heimlich maneuver on a patron who was choking on food.  (RT 5/24/89 at 22-24.)  Annenberg also testified concerning an interview of Brian Mize.  Mize was not a favorable witness at trial; he stated that Petitioner tried to sell him a car stereo removed from the victim's Porsche, that Petitioner told him he had killed the victims, and that Petitioner had been "bragging" about it.  (RT 3/14/89 at 157-58.)  During an interview with Annenberg, however, Mize told him that rather than bragging about the murders, Petitioner indicated he was upset about what he had done and had trouble sleeping.  To bolster this testimony he submitted an affidavit from Mize.  (RT 5/24/89 at 26-27.)  Finally, Annenberg testified that he interviewed a Pima County Deputy named Henshaw who worked at the jail where Petitioner was housed.  He recounted that Henshaw told him that Petitioner was a good prisoner who made no trouble.  Henshaw also told him that he thought Petitioner acted very immature.  (*Id.* at 27-31.)

Shannon Ray Wood testified that he worked with Petitioner at a local McDonald's from the summer of 1987 until March 1988, shortly before the crime.  Wood testified that they became friends and that he did not believe Petitioner was a violent person.  He further stated that because Petitioner had his own apartment he thought Petitioner was "very mature."  (RT 5/24/89 at 45-51.)  In a deposition provided to the court in lieu of testimony,

a former employer, Rose Walsh, described Petitioner as "a model employee and very good worker." (RT 6/2/89 at 81; ROA I at 693.)

John Burgess testified that he attended a special needs high school in Texas with Petitioner and that they were friends. At the time, Burgess was in ninth grade and Petitioner was in sixth grade. Burgess said he did not believe Petitioner was a violent person and that he never saw Petitioner act aggressively toward other students or fight. Burgess testified that he was a motorcycle mechanic and that Petitioner helped him work on bikes. However, Petitioner was a slow learner and had to be supervised for this work. Burgess also testified that Petitioner's older brother often put him down and that his father used corporal punishment on him, though not excessively. (RT 5/24/89 at 119-31.) On cross-examination, Burgess stated that Petitioner stole things. In particular, he noted that Petitioner liked to steal car stereos. Burgess thought Petitioner was very nice, except for the stealing problem. (*Id.* at 131-37.)

Petitioner's mother, Patricia Greenway, testified that everyone in the family was hard on Petitioner because he was a slow learner and had trouble in school. She thought he was lazy and just did not try hard enough. She said that Petitioner's older brother and his father teased him about being slow. She also described Petitioner as a "loving son" and could not believe he could commit murder, although she did believe he might commit burglary. (RT 5/24/89 at 139-54.)

Petitioner's half-sister, Sandra Weese, and her husband, John Weese, also testified. Sandra recalled that Petitioner had trouble learning when he was young and that his father and brother abused Petitioner psychologically because he did poorly in school. Petitioner lived with her and her family in a trailer between October 1986 and June 1987, when he left and got his own apartment. Sandra testified that Petitioner got along well with everyone, was very good with her two young children, was not aggressive, and was not very mature for his age. She also said that Petitioner had told her he committed the murders but was very

- 29 -

remorseful.  (RT 6/2/89 at 4-17.)  John testified that Petitioner had trouble following direction and completing tasks.  He also described Petitioner as not physically aggressive. (RT 6/2/89 at 20-30.)

Petitioner also called a psychological expert, Dr. Harry Saslow.  Dr. Saslow examined Petitioner on two occasions prior to trial and administered several tests, including the Wechsler Adult Intelligence Scale Revised, the Rohrschach ink blots, the Joztech (ph) Wide Range Achievement Test, Second Revision, and the Bender Visual Motor Gestalt Test.[9]  (RT 5/24/89 at 78.)  Dr. Saslow testified that he received general information on Petitioner's background and family upbringing.  Based on the tests administered, Saslow determined that Petitioner had a full scale I.Q. of 72, which he characterized as borderline functioning.[10]  (Id. at 81-83.)  He testified that Petitioner's low I.Q. made him prone to impulsiveness and a lack of judgment, and he described Petitioner's mental functioning as akin to the level of an 11 or 12-year old.  (Id. at 91.)  Dr. Saslow further stated that Petitioner did not display any indication of violence based on the tests he administered, and he found no indication that Petitioner would be troublesome in prison or incapable of rehabilitation.  (Id. at 96-97.)  On cross-examination, Dr. Saslow acknowledged Petitioner was not insane under the traditional M'Naghten definition.  He further opined that Petitioner was capable of making judgments and that his testing revealed no basis for finding the existence of psychosis.  (Id. at 98-115.)

Finally, defense counsel prepared two sentencing memoranda.  (ROA I at 663-94.) The first argued that the evidence was insufficient to establish the culpable requisite mental state as required by Enmund v. Florida, 458 U.S. 782 (1982), and Tison v. Arizona, 481 U.S.

---

[9]      Petitioner has not proffered, and the state court record does not contain, any report, notes, interview, or declaration of Dr. Saslow.  Therefore, the only information available to this Court is the transcript of Dr. Saslow's testimony at the aggravation/mitigation hearing.

[10]     Dr. Saslow testified that 84 to 86 percent of the population is functioning on a better level than Petitioner, in terms of I.Q.  (RT 5/24/89 at 83.)

137 (1987). (*Id.* at 663-65.) It further argued against each of the aggravating factors alleged by the prosecution. (*Id.* at 665-77.) For mitigation, counsel asserted that Petitioner's age and immaturity constituted a statutory mitigating factor under A.R.S. § 13-703(G)(5), that proportionality review and comparison of Petitioner's case to similarly-situated defendants counseled against a death sentence, that the death penalty was immoral, and that execution by lethal gas was cruel and unusual punishment. (*Id.* at 677-85.)    In the second memorandum, counsel argued that Petitioner's mental retardation, learning disability, remorse, prior good deeds, good behavior while in custody, lack of significant criminal history, lack of violent propensity, and potential for rehabilitation constituted additional mitigating factors. (*Id.* at 687-94.) Counsel also pointed out that Petitioner had not been raised in a supportive environment, noting that his mother mistook his learning disability for laziness and that his father and brother "constantly belittled and criticized" him. (*Id.* at 693.)

### 3.    *Failure to Call Dr. David to Testify*

Petitioner contends that counsel rendered ineffective assistance at sentencing by failing to call Dr. Ronald David to testify at the mitigation hearing. Petitioner asserts that the decision not to call Dr. David "was illogical, unsupported, and against the best interest of Mr. Greenway." (Dkt. 78 at 22.) He further asserts that "Dr. David's testimony was critical to saving Mr. Greenway's life" because the expert who did testify at the hearing, Dr. Saslow, was ill-prepared to testify because he had not reviewed all Petitioner's background history and was only cursorily familiar with Petitioner's situation, whereas Dr. David "could have provided support for other mental heath mitigation." (*Id*. at 23.)

Review of the record indicates that just prior to presenting Dr. Saslow's testimony, sentencing counsel stated he wished to also present testimony from Dr. David, "for the limited purposes of evaluation based upon a clinical interview of a mental status

- 31 -

examination."[11]   (RT 5/24/82 at 57.)   In an effort to limit cross-examination regarding potentially damaging information revealed to Dr. David during his examination of Petitioner, counsel asserted that Dr. David's testimony "would not concern culpability, state of mind at the time of the offense or his assessment as to what was going on at the time of the offense." (*Id.* at 59.)   Counsel therefore moved the court to preclude the prosecution from cross-examining on "any statements made by [Petitioner to Dr. David] concerning the incident or any inquiry into the incident itself." (*Id.* at 60.)   Counsel explained, "I can envision that even if we were to limit our testimony that the Prosecutor would immediately want to go into that thing and try to elicit statements and things and his opinions about whether or not Mr. Greenway was doing this or that or had a certain mind, was he mean and nasty at the time of the crime, was he not, various other things." (*Id.*; *see also* PR doc. 12, Ex. K.)

The trial court denied the motion to limit the scope of cross-examination:

> All right.  The testimony which the Defense would want to elicit from Dr. David goes directly towards certain mitigating factors which have been disclosed and elicited by the Defendant, one of which is the Defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was substantially impaired, but not so impaired as to constitute a defense, such as his immaturity, his I.Q.

> The Defense is the party that is calling Dr. David, and they cannot use the physician-patient privilege both as a shield and a sword.  And I think that for the Court to get the full truth from the witness, it is necessary that full cross-examination be made.

> So the Court is not going to limit any type of cross-examination of Dr. David, and the State may examine Dr. David on his previous encounters with Mr. Greenway and any statements that Mr. Greenway made to Dr. David in any of his interviews or treatment sessions.

(RT 5/24/89 at 65-66.)

Following this ruling, counsel stated that Dr. David would not be called as a witness. However, counsel made the following proffer as to his testimony:

---

[11]     Dr. David interviewed Petitioner prior to trial but did not testify at trial.  (RT 5/24/89 at 57.)

- 32 -

Dr. David would testify that he had a clinical interview with Mr. Greenway, that along with that clinical interview he reviewed various documents concerning Mr. Greenway, concerning background and other individuals that knew him. He also reviewed certain psychological testing done by Dr. Saslow.

He would testify that in his opinion that he concurred or that he believes that Mr. Greenway is – has a low I.Q., that it is certainly within the parameters of the I.Q. testing done by Dr. Saslow. He also concurs that based upon his upbringing and other factors, that he had developed an immature personality in the fact that he acts similar to a child, that he does not always measure the right course of action before proceeding, that he does not consciously look upon alternatives in a mature and thoughtful manner.

He would also testify that Mr. Greenway does not fit within any kind of characterological disorder from these interviews, such as a psychopath or sociopath, that he does have some schizoid type tendencies.

He would also testify that based upon his review of all the materials, that there is nothing from the testing done or the previous lifestyle to indicate a person that is brutal or a person that takes delight in some type of brutality or torturous type of conduct.

He would also testify that, and this is from a personality status, personality type of evaluation. He would also testify – and he would also agree with the proposed testimony from Dr. Saslow that he is functioning at an eleven or twelve-year-old level.

He would also testify that in his opinion, based upon all the information that he has presently, that Mr. Greenway would not be any kind of security risk in a prison setting. That he is a person that would probably not be involved in violent behavior. He would be a person – would normally follow the rules of that particular setting.

He also believes that because of the immature – of his immaturity at this time there is a good possibility of rehabilitation – that he could be rehabilitated, in fact would be a good candidate for rehabilitation.

He would also testify that based upon his review of the material as far as the testing is concerned, as far as other things used, that there is not, psychological speaking, a great likelihood of repeat violent behavior.

(RT 5/24/89 at 66-68.)

In light of the proffer, the Court notes that much of the potential testimony from Dr. David would have been duplicative of the testimony provided by Dr. Saslow. For instance, Dr. Saslow testified at the hearing that Petitioner had a low I.Q. (which caused mental limitations and made him prone to impulsiveness and a lack of judgment), functioned with

1    the cognitive ability of an 11-year-old, and had an "overall social maturity level [that] may

2    not quite even be that far advanced, though close." (RT 5/24/89 at 88, 91, 93-95.) Dr.

3    Saslow also opined that Petitioner did not have a violent personality, would not be

4    troublesome in prison, and had potential for rehabilitation. (*Id.* at 96-97.)

5         However, even more compelling than the fact that Dr. David's testimony would have

6    been largely duplicative, the drawbacks to calling him as a witness were substantial. In a

7    worksheet on his interview with Petitioner,[12] Dr. David recounts Petitioner making

8    inculpatory statements concerning his participation in the murder. (ROA II at 101-03.) The

9    worksheet states that Petitioner said he and Chris Lincoln had discussed committing a

10    burglary or robbery in the weeks leading up to the murders because they were out of work

11    and needed money. (*Id.* at 101.) He described stealing rifles. (*Id.*) He told David that when

12    they went to the victims' house he looked inside and knew both victims were there. (*Id.* at

13    102.) When they went inside, Lincoln held the gun on the women while Petitioner searched

14    the house for others and to see what he wanted to steal. (*Id.*) He told Lincoln to shoot Lili

15    in the leg if she did not obey his commands. (*Id.*) Lincoln did as instructed, and Petitioner

16    told Lincoln to give him the gun and to leave and wait in the victim's car. (*Id.*) Petitioner

17    then proceeded to methodically shoot the victims in the head, execution-style, using a pillow

18    to cover each. (*Id.*) Petitioner said that after Lincoln had shot Lili in the leg, he felt he had

19    no choice but to kill them both to avoid getting into trouble. (*Id.*) Petitioner also told David

20    that the crime "felt like a big adventure" and made him feel like "the master" or Charles

21    Bronson in the movie "Death Wish." (*Id.* at 103-04.)

22         In light of the trial court's ruling, if Dr. David had testified the State could have cross-

23

24

25        [12]   Dr. David did not prepare a formal written report. (Dkt. 1D, Ex. II.) The only

26    available materials concerning his examination of Petitioner are a page of handwritten notes, a worksheet detailing the interview and his observations of Petitioner, and a letter to first

27    PCR counsel Kaufman stating that he had made a diagnosis of Inadequate Personality Disorder. (*Id.*)

28

examined him on these statements.  Such testimony by Dr. David would have confirmed many of the incriminating facts presented by the prosecution at trial via other witnesses, such as Brian Mize and Anthony Schmanski, not to mention statements made by accomplice Chris Lincoln during post-arrest police interviews,[13] all implicating Petitioner as the instigator in the planned crimes and the trigger man in the killings.  In addition, Dr. David could have been questioned about the callous nature of Petitioner's statements, such as the incident being an "adventure," thus undercutting Petitioner's claim of remorse.  (ROA II at 102-03; Dkt. 90, Ex. E at 4-5.)  The doctor's testimony would have been especially damaging given the fact that Petitioner made these statements under the umbrella of patient-therapist confidentiality (and presumably was forthright with the doctor).  The evidence also could have been used to reinforce both the "pecuniary gain" and "especially cruel, heinous or depraved" aggravating factors urged by the prosecution.  Under these circumstances, counsel could have reasonably concluded that not calling Dr. David, and maintaining the confidentiality of Petitioner's statements to him, was preferable to waiving patient-client confidentiality.  *See Strickland*, 466 U.S. at 690 ("[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable."); *Raley v. Ylst*, 470 F.3d 792, 801 (9th Cir. 2006) (holding that a strategic choice not to call an expert will not constitute ineffective assistance of counsel if that choice was reasonable under the circumstances).

Petitioner argues that counsel's decision not to call Dr. David was not reasonable because accomplice Chris Lincoln's statements implicating Petitioner were nonetheless

---

[13]     Audiotapes of a post-arrest interview of Lincoln by police, wherein Lincoln implicated Petitioner as the leader in the crimes and the triggerman, were admitted into evidence at the mitigation hearing.  (RT 6/2/89 at 88-95.)  Although a transcript of these tapes is not part of the record presented to this Court, Petitioner does not dispute that Lincoln so implicated Petitioner, as recounted by the Arizona Supreme Court in their opinion on direct appeal.  *See Greenway*, 170 Ariz. at 159, 823 P.2d at 26.

- 35 -

admitted.  (Dkt. 78 at 23.)  The Court disagrees.  Irrespective of any statements made by Lincoln implicating Petitioner (whose motive for implicating Petitioner could easily be portrayed as self-serving), counsel's desire to avoid cross-examination of Dr. David is based entirely on statements Petitioner made to Dr. David, not anyone else.  Moreover, Dr. David's testimony would have provided further corroboration to Lincoln's statements implicating Petitioner as the actual killer.

Similarly, Petitioner cannot show prejudice from counsel's failure to call Dr. David.  As noted, much of Dr. David's proposed testimony was duplicative of the testimony of Dr. Saslow.  Even assuming Dr. Saslow's findings would have been bolstered by Dr. David's similar conclusions, those findings, considered against the evidence presented at trial and at sentencing of the cold, deliberate manner in which Petitioner carried out the burglary and the murders, together with the damaging cross-examination that could have resulted had Dr. David actually testified, do not create a reasonable likelihood that if Dr. David had testified at the hearing, Petitioner would not have been sentenced to death.  *See Raley*, 470 F.3d at 802-03 (finding no prejudice where "the experts' reports contained damaging content that would have come to light through cross-examination and, on balance, would have hurt more than helped").  For all these reasons, the PCR court's denial of this claim was not an objectively unreasonable application of *Strickland.*

4. *Failure to Properly Prepare Dr. Saslow to Testify*

At the mitigation hearing, Dr. Saslow testified that he was given "some verbal information after I saw [Petitioner] for the first time.  I was given some reports, his schooling, social reports gathered by an investigator for [counsel] with respect to interviews of the stepsister, mother, et cetera."  (RT 5/24/89 at 98.)  He conducted two separate interviews of Petitioner and administered four separate psychological tests.  (*Id*. at 77-78.)  Based on his review of the background information provided, the interviews, and the tests, Dr. Saslow determined that Petitioner had a borderline I.Q. of 72, which made him prone to

immaturity, impulsiveness, and a lack of judgment, and that his mental functions were at the level of an 11 or 12-year old. (*Id.* at 81-83, 91, 96-97.) On cross-examination, Dr. Saslow conceded that he read some of the background materials in only a "cursory way." (*Id.* at 99.)

Petitioner argues that sentencing counsel was ineffective because he failed to provide Dr. Saslow with Petitioner's family, social, or educational history. (Dkt. 62 at 18.) He further contends that Dr. Saslow's "cursory" review of the information he was provided allowed the State to argue that Dr. Saslow's testimony should not be considered. Petitioner argues the sentencing judge "apparently followed that advice because he only found age as a mitigating factor and failed to even discuss mental health issues." (Dkt. 78 at 16.) Although counsel's failure to provide mental health experts with necessary information to prepare their testimony can rise to the level of ineffective assistance of counsel, *see Silva v. Woodford*, 279 F.3d 825, 843 (9th Cir. 2002), Petitioner's claim is too cursory and vague to support habeas relief. Other than asserting that Dr. Saslow failed to fully read background information given to him and that sentencing counsel was ineffective in not providing his expert with additional family background information,[14] Petitioner provides no specific facts to support his claim that Dr. Saslow's lack of preparation caused the sentencing court to discount his testimony, and nothing in the record suggests that the sentencing judge failed to consider or give any weight to Dr. Saslow's testimony.

In imposing the death sentence, the trial court did not indicate it considered Dr. Saslow's testimony less than compelling because of his admittedly cursory review of the background materials in preparing for his examination of Petitioner. In fact, the sentencing court stated it had "considered all . . . mitigating factors, those presented at the aggravation-mitigation hearing, and also those which have been submitted to the Court in the sentencing

---

[14]     This additional information consisted of evidence of socialization problems concerning Petitioner's half-brother and half-sister, that Petitioner and his siblings were born "extremely and unhealthily large," that Petitioner experienced high fevers in 1971 and 1972, and that his parents were diabetic.

memorandum and any other matters of record." (RT 6/15/89 at 34-35.)  Based on this statement, it is clear the trial court, contrary to Petitioner's assertion, did consider Dr. Saslow's testimony in assessing Petitioner's mitigation.

In addition, Petitioner does not allege how additional information would have affected his expert's evaluation.  Dr. Saslow specifically testified that his conclusions concerning Petitioner's mental status – namely his borderline I.Q. and corresponding lack of maturity, impulsivity, and 11 to 12-year-old intellectual functioning – were predicated primarily on the psychological tests he performed, not on any background materials provided by counsel, which he described as "supplemental information." (RT 5/24/89 at 100.)

In sum, Petitioner's cursory assertions concerning the failure to prepare Dr. Saslow to testify effectively is insufficient to warrant habeas relief.  As a result, the PCR court's denial of this claim was not an objectively unreasonable application of *Strickland*.

### Claim B: Judicial Disqualification

Petitioner contends his Fifth, Sixth and Fourteenth Amendment rights to due process and a fair trial were violated when the trial court, Judge Scholl, did not recuse himself based on a personal connection to the victims.  Specifically, he contends the judge failed to disclose that he worked and was friends with Vince Peters, who was once married to Lili Champagne and was Mindy Peters's father. (Dkt. 62 at 29; Dkt. 78 at 30-31.)

#### A.    Background

In support of this claim, Petitioner relies on a memorandum prepared by the Human Resources Commander of the Tucson Police Department (TPD) and a declaration from an alternate juror proffered to the state court during his first PCR proceeding.  The memorandum states that Judge Scholl and Vince Peters were both serving as officers in the Tucson Police Department (TPD) between July 1970 and September 1971. (ROA II at 666.) It further states that the only time period during which they could have worked together was between March 22 and May 24, 1971, and that Vince Peters was killed in a traffic accident

on July 12, 1978.  (*Id.*)  The juror declaration states that after being selected as an alternate, the juror had a private conversation with Judge Scholl in chambers during which the judge said he used to be a police officer and that his partner had been Lili Champagne's ex-husband.  (*Id.* at 642.)

Petitioner first presented this claim as part of his motion to reconsider the denial of PCR relief and to re-open and amend the first PCR petition.  (*Id.* at 700-04.)  Although the trial court determined the claim should be heard on the merits because it alleged newly-discovered evidence, it nevertheless denied relief, stating:

> [D]espite the fact that this issue is not precluded by Rule 32.2, it is moot.  The standard under Rule 32 is whether, if the evidence were true, it would change the outcome of the case.  *State v. Bilke*, 162 Ariz. 51, 781 P.2d 28 (1989).  In *State v. Greenway*, 170 Ariz. 155, 823 P.2d 22 (1991), the Arizona Supreme Court reviewed the sentencing of Mr. Greenway.  In that opinion, the Court conducted an extensive review of the sentencing history.  The Court further considered, individually, each aggravating and mitigating factor considered by the trial court, and found no error.  Thus, because the Arizona Supreme Court has already approved Judge Scholl's consideration of the aggravating and mitigating factors, this Court cannot find that, but for Judge Scholl's possible relationship with the victims in this case, the outcome would have been different.

(*Id.* at 750.)  The Arizona Supreme Court summarily denied review without explanation.

## B.    Clearly Established Supreme Court Law

A defendant is entitled to a fair trial, free from judicial bias.  *In re Murchison*, 349 U.S. 133, 136 (1955).    There is a presumption that judges are unbiased, honest, and have integrity .  *See Schweiker v. McClure*, 456 U.S. 188, 195 (1982); *Withrow v. Larkin*, 421 U.S. 35, 47 (1975).  Similarly, there is a presumption that judicial officials have "properly discharged their official duties."  *Bracy v. Gramley*, 520 U.S. 899, 909 (1997) (quoting *United States v. Armstrong*, 517 U.S. 456, 464 (1996)).  A petitioner may show judicial bias in one of two ways, by demonstrating the judge's actual bias or by showing that the judge had an incentive to be biased sufficiently strong to overcome the presumption of judicial integrity (i.e., a substantial likelihood of bias).  *Paradis v. Arave*, 20 F.3d 950, 958 (9th Cir. 1994); *Fero v. Kerby*, 39 F.3d 1462, 1478-79 (10th Cir. 1994).  "Supreme Court precedent

reveals only three circumstances in which an appearance of bias – as opposed to evidence of actual bias – necessitates recusal." *Crater v. Galaza*, 491 F.3d 1119, 1131 (9th Cir. 2007). These are (1) when the judge has a direct, substantial pecuniary interest in the outcome of the case; (2) when the judge becomes embroiled in a running, bitter controversy with one of the litigants; and (3) when the judge acts as part of the accusatory process. *Id.*

### C.    Analysis

The Court notes at the outset that Petitioner does not allege actual bias on Judge Scholl's part. Rather, he contends the circumstances surrounding Judge Scholl's relationship to Vince Peters create an "appearance" of impropriety. (Dkt. 78 at 30.) In particular, he asserts that "[t]his unusual set of facts, on their face, may not itself manifest actual prejudice," but argues that "when coupled with the unique circumstances that are involved in law enforcement's peculiar 'loyalties' or 'codes' . . . calls into question whether the mere existence of such a connection is constitutionally intolerable." (*Id.* at 51.)

Petitioner has failed to allege, and the record does not establish, that Judge Scholl's alleged connection to the victims falls within the narrow category of instances supporting a due process violation based on the mere appearance of bias. Petitioner cites no evidence, nor even alleges, that Judge Scholl had either a pecuniary interest in the outcome, was personally impugned by Petitioner or someone associated with him, or was part of the accusatory process. *See Winthrow*, 421 U.S. at 47. Absent evidence such evidence, the Court must conclude that any allegation of an "appearance of bias" based on Judge Scholl's alleged past relationship with Vince Peters does not create a "probability of unfairness" sufficient to establish a violation of federal due process. *Id.*; *see also Crater v. Galaza*, 491 F.3d at 1131 (holding due process requires recusal only when three examples outlined in *Winthrow* are implicated).

Here, the evidence shows, at best, that for a brief period of time (two to three months at most), eighteen years prior to trial, Judge Scholl and Vince Peters *may* have worked or

even partnered together as police officers.  In addition, by the time of trial, Vince Peters had been deceased for eleven years.  Petitioner can point to no evidence indicating that Judge Scholl had a personal relationship or even acquaintance with either Lili Champagne or Mindy Peters.  This evidence is insufficient to overcome the presumption that Judge Scholl properly discharged his duties at Petitioner's trial and sentencing.  *See Bracy*, 520 U.S. at 909. Several cases have found no actual conflict of interest requiring recusal in similar situations. *See Horwitz v. Alloy Automotive Co.*, 992 F.2d 100, 104 (7th Cir. 1993) (finding recusal not required where judge lived in same neighborhood as one of the defendants and knew his parents socially); *United States v. Lovaglia*, 954 F.2d 811, 816 (2nd Cir. 1992) (affirming trial court's denial of a recusal motion based in part on judge's social relationship with family members of a RICO defendant where any such relationship had ceased seven or eight years prior to trial); *United States ex. Rel. Perry v. Cuyler*, 584 F.2d 644, 647 (3rd Cir. 1978) (finding no due process violation where judge who presided at trial of police detective's alleged murderer knew the detective and attended his funeral).

Petitioner has not established facts sufficient to support a finding of a federal due process violation based upon an "appearance" of bias arising out of Judge Scholl's possible distant relationship with Vince Peters.  Therefore, Petitioner is not entitled to an evidentiary hearing, *Townsend*, 372 U.S. at 312-13, and the PCR court's denial of relief on this claim was neither contrary to nor an unreasonable application of controlling Supreme Court law.

### Claim D-5:  Failure to Consider Mitigating Evidence

Petitioner contends that the trial judge who determined his sentence failed to consider all relevant mitigation that was presented at the mitigation hearing.  (Dkt. 78 at 54.)  In particular, Petitioner argues that the sentencing court failed to consider his borderline I.Q. of 72, his lack of maturity, and his inability to comprehend or react normally to a situation. (*Id.* at 55.)

1      **A.    Background**

2      In sentencing Petitioner to death, the state court found three aggravating factors: (1)

3  that he committed the murders "as consideration for the receipt or in the expectation of the

4  receipt of anything of pecuniary value;" (2) "[he] committed the offense . . . in an especially

5  heinous, cruel and depraved manner;" and (3) "he has been convicted of one or more other

6  homicides . . . which were committed during the commission of the offense."  (RT 6/15/89

7  at 33-34.)

8      Against these aggravating factors, defense counsel asserted that Petitioner's age

9  constituted a statutory mitigating factor under A.R.S. § 13-703(G)(5).  He also argued as

10  mitigation Petitioner's emotional and psychological immaturity and borderline IQ, his non-

11  violent nature, remorse, prior good deeds, verbally abusive upbringing, good behavior while

12  in custody, lack of significant criminal history, lack of violent propensity, historical use of

13  drugs, and potential for rehabilitation.  (ROA I at 677-85, 687-94; RT 5/24/89 at 22-31, 47-

14  51, 80-97, 122-29, 142-54; RT 6/2/89 at 6-17, 24-29, 51-57; RT 6/15/89 at 6-11, 20-30.)

15      In weighing the mitigation proffered by Petitioner, the trial court held:

16          Looking at A.R.S. 13-703(G), the Court specifically finds there is a

17  mitigating factor, and that is the age of the Defendant.  At the time of the
killings the Defendant was nineteen years old, only one year into adulthood.

18          *The Court has considered all other mitigating factors, those presented*

19  *at the aggravation-mitigation hearing, and also those which have been*
*submitted to the Court in the sentencing memorandum and any other matters*

20  *of record.*

21  (RT 6/15/89 at 34-35; emphasis added.)  The court then concluded:

22          In looking at the mitigating factor of the age of the Defendant, the Court

23  finds that the Defendant's actions, evidence of brutality which far outweighs
his chronological, emotional or mental age, and the Court finds that there are

24  no other mitigating factors sufficiently substantial to call for leniency.

25  (*Id.* at 35.)

26      Petitioner raised this issue on direct appeal.  In denying the claim, the Arizona

27  Supreme Court stated:

28

Defendant argues that because he has an I.Q. of 72, he "is not only immature and learning disabled, but is genuinely mentally retarded." He also argues that "the effect of the retardation on . . . his ability to realize what he was doing has to be considered as a mitigating factor." We do not agree.

Defendant's own expert testified that defendant was borderline functional, and *not* mentally retarded. Moreover, the expert testified that a person with an I.Q. of 72 is fully capable of functioning in society and that defendant was capable of making judgments with limited impairment. Defendant's former work manager testified that defendant was a responsible person, that he had been picked for promotion because he had shown an ability to supervise other people and that he handled problems without any outbreak of irrational behavior. . . .

We cannot accept defendant's argument that, because he was inept at committing this crime and lacked criminal sophistication, his sentence should be reduced. We have never held that, as part of the sentencing process, the court must look at the crime itself to determine if it was carried out with criminal sophistication. We agree with the trial court, that under the facts of this case, defendant's I.Q. of 72, which places him in a borderline functioning category, was neither significant enough to qualify as a mitigating factor, nor sufficiently substantial to call for leniency.

. . . .

Defendant's last argument is that codefendant's life sentence is a mitigating factor in defendant's favor. Although a codefendant's life sentence could be a mitigating factor, we do not find it to be one in this case. At codefendant's sentencing, the court found that codefendant's age, 16 at the time of the offense, and the fact that defendant actually executed the women called for leniency.

As noted above, therefore, defendant's age of 19 is the only mitigating factor. Like the trial court, we also conclude that it was not sufficient to outweigh the three aggravating factors.

In *State v. Valencia*, we recognized that a defendant's young age is "a substantial and relevant factor" that should be given "great weight." But we also recognized that age, in and of itself, will not reduce every death penalty to a life sentence. When addressing the issue of a young age, we look at the defendant's level of maturity, judgment and involvement in the crime. . . .

Defendant's participation in this crime was substantial and his actions were deliberate. Not only did he plan the robbery two weeks before hand, he alone executed the two women. The trial court found that "defendant's actions in the crime and the evidence of brutality far outweighed his chronological, emotional and mental age." Therefore, defendant's age is insufficient to call for leniency when weighed against the three aggravating factors.

. . . We have also independently reviewed the record for further evidence of mitigation beyond the issues presented by defendant and have found none.

- 43 -

1
2
3

> Defendant argues that the trial court failed to consider and find the other mitigating factors he proffered. We disagree. The trial court stated that it "[had] considered *all other* mitigating factors, those presented at the . . . hearing, and also those . . . submitted . . . in the sentencing memorandum and *any other* matters of record." (emphasis added). We find no error.

4

*Greenway*, 170 Ariz. at 169-70, 823 P.2d at 36-37 (citations omitted).

5

### B.    Clearly Established Supreme Court Law

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

A sentencing court is required to consider any mitigation offered by a defendant, including non-statutory mitigation. *See Lockett v. Ohio*, 438 U.S. 586, 604 (1978); *see also Ceja v. Stewart*, 97 F.3d 1246, 1251 (9th Cir. 1996). In *Lockett* and subsequently in *Eddings v. Oklahoma*, 455 U.S. 104 (1982), the Supreme Court held that under the Eighth and Fourteenth Amendments the sentencer must be allowed to consider, and may not refuse to consider, any constitutionally relevant mitigating evidence. *Eddings*, 455 U.S. at 113-14. Constitutionally relevant mitigating evidence is "any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett*, 438 U.S. at 604. However, while the sentencer must not be foreclosed from considering relevant mitigation, "it is free to assess how much weight to assign such evidence." *Ortiz v. Stewart*, 149 F.3d 923, 943 (9th Cir. 1998); *see Eddings*, 455 U.S. at 114-15 ("The sentencer . . . may determine the weight to be given the relevant mitigating evidence.") On habeas review, a federal court does not evaluate the substance of each piece of evidence submitted as mitigation; rather, it reviews the state court record to ensure the state court allowed and considered all relevant mitigation. *See Jeffers v. Lewis*, 38 F.3d 411, 418 (9th Cir. 1994) (en banc) (when it is evident that all mitigating evidence was considered, the trial court is not required to discuss each piece of evidence).

24

### C.    Analysis

25

26

27

Upon review, the Court concludes that the trial court carried out its constitutional obligation to consider all relevant mitigation offered by Petitioner. At sentencing, the trial court stated that, in addition to the statutory factor of Petitioner's age, it had "considered all

28

other mitigating factors, those presented at the aggravation-mitigation hearing, and also those which have been submitted to the Court in the sentencing memorandum and any other matters." (RT 6/15/89 at 34-35.)  Likewise, on appeal the Arizona Supreme Court noted this statement and found Petitioner's claim to be without merit.  In addition, the Arizona Supreme Court independently reviewed all of the mitigation offered by Petitioner and also stated that it had "reviewed the record for further evidence of mitigation beyond the issues presented by defendant and found none."  *Greenway*, 170 Ariz. at 169, 170, 823 P.2d at 36, 37.  Thus, the record indicates that both the sentencing court and Arizona Supreme Court, contrary to Petitioner's assertion, considered all proffered mitigation in determining that a sentence of death was appropriate.

Petitioner's principal argument is not that the state courts failed to consider his proffered mitigation, but that they failed to accord it the weight he believes it deserved. (*See* Dkt. 78 at 55-59.)  However, there is a distinction between "a failure to consider relevant evidence and a conclusion that such evidence was not mitigating"; the latter determination does not implicate a defendant's federal constitutional rights. *Williams v. Stewart*, 441 F.3d 1030, 1057 (9th Cir. 2006).  Thus, the fact that the court found the evidence "inadequate to justify leniency . . . did not violate the constitution." *Ortiz*, 149 F.3d at 943; *Eddings*, 455 at 114-15.  Moreover, although the sentencing court specifically discussed only the issue of Petitioner's age, the failure to discuss each mitigation issue does not amount to an Eighth Amendment violation. *See Moormann v. Schriro*, 426 F.3d 1044, 1055 (9th Cir. 2005), *cert. denied*, 126 S. Ct. 2984 (2006) ("the trial court need not exhaustively analyze each mitigating factor as long as a reviewing federal court can discern from the record that the state court did indeed consider all mitigating evidence offered by the defendant"); *Parker v. Dugger*, 498 U.S. 308, 314-15, 318 (1991) (the sentencing court properly considered all information, including nonstatutory mitigation, where the court stated that it considered all the evidence and found no mitigating circumstances that outweighed the aggravating circumstances).

Based on the foregoing, the Arizona Supreme Court's denial of relief on this issue was neither contrary to nor an unreasonable application of controlling Supreme Court law.

**CERTIFICATE OF APPEALABILITY**

Rule 22(b) of the Federal Rules of Appellate Procedure provides that when an appeal is taken by a petitioner, the district judge who rendered the judgment "shall" either issue a certificate of appealability (COA) or state the reasons why such a certificate should not issue. Therefore, in the event that Petitioner appeals, this Court on its own initiative has evaluated the claims within the petition for suitability for the issuance of a COA. *See* 28 U.S.C. § 2253(c); *Turner v. Calderon*, 281 F.3d 851, 864-65 (9th Cir. 2002).

Pursuant to 28 U.S.C. § 2253(c)(2), a COA may issue only when the petitioner "has made a substantial showing of the denial of a constitutional right." With respect to claims rejected on the merits, a petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). For procedural rulings, a COA will issue only if reasonable jurists could debate whether the petition states a valid claim of the denial of a constitutional right and whether the court's procedural ruling was correct. *Id.*

The Court finds that reasonable jurists could not debate its resolution of Claims A, B, and D-5 as set forth in this Order. Further, for the reasons stated in the Court's order of July 27, 2000 (Dkt. 65), the Court declines to issue a COA with respect to the claims in that order found to be procedurally barred, not cognizable, or meritless.

**CONCLUSION**

None of the claims presented by Petitioner in this habeas corpus action warrant relief. The claims are either plainly meritless, procedurally barred, or not cognizable. The Court also finds that an evidentiary hearing is neither warranted nor required. In addition, the Court finds that justice does not require allowing amendment to add additional non-cognizable and meritless claims.

Accordingly,

**IT IS ORDERED** that Petitioner's Request to Amend Habeas Petition, Request for Evidentiary Hearing, and Request for this Court to Order the State File (Dkt. 139) are **DENIED**.

**IT IS FURTHER ORDERED** that Petitioner's Amended Petition for Writ of Habeas Corpus (Dkt. 61) is **DENIED**. The Clerk of Court shall enter judgment accordingly.

**IT IS FURTHER ORDERED** that the stay of execution entered on January 15, 1998 (Dkt. 11), is **VACATED**.

**IT IS FURTHER ORDERED** denying a Certificate of Appealability.

**IT IS FURTHER ORDERED** that the Clerk of Court send a courtesy copy of the Order to the Clerk of the Arizona Supreme Court, 1501 W. Washington, Phoenix, Arizona 85007- 3329.

DATED this 25th day of September, 2007.

Raner C. Collins
United States District Judge

CC: Clerk Arizona Supreme Court (copied 9/25/07)