**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Richard Harley Greenway, | No. CV-98-25-TUC-RCC |
| Petitioner, | <u>DEATH PENALTY CASE</u> |
| v. | **MEMORANDUM OF DECISION AND ORDER** |
| Charles L. Ryan, et al., | |
| Respondents. | |

The Court of Appeals for the Ninth Circuit remanded this matter for consideration on the merits of Petitioner's claims alleging ineffective assistance of counsel during trial and on direct appeal. *See Greenway v. Schriro*, 653 F.3d 790, 797–800 (9th Cir. 2011).  The parties filed supplemental briefs, and Petitioner requested an evidentiary hearing.  Petitioner also filed a motion to stay these proceedings so that he may exhaust a new claim in state court.  After fully considering the briefs and arguments, the Court determines that Petitioner is not entitled to habeas relief.  The Court further declines to stay these proceedings.

## BACKGROUND

On March 28, 1988, a Porsche 944 belonging to Frank and Lili Champagne was found abandoned and burned.  When authorities went to the Champagne home to investigate, they discovered the bodies of Lili Champagne and her daughter, Mindy Peters.  Each had been shot to death.

Petitioner and co-defendant Chris Lincoln were charged and tried separately on two

counts of first degree murder and one count each of first degree burglary, armed robbery, theft by control, and arson of an unoccupied structure.  A jury convicted Petitioner of all counts on March 17, 1989.  Pima County Superior Court Judge William Scholl sentenced him to death for each murder and various prison terms for the other counts.[1]  The Arizona Supreme Court affirmed.  *See State v. Greenway*, 823 P.2d 22 (Ariz. 1991).  Petitioner did not seek certiorari in the United States Supreme Court.

Following unsuccessful state post-conviction-relief proceedings, Petitioner filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  This Court ultimately denied relief.  (Doc. 149.)[2]  On appeal, the Ninth Circuit affirmed, except as to claims alleging ineffective assistance of counsel (IAC) at trial and on direct appeal. 653 F.3d at 793. Specifically, the court determined that the state court's finding of waiver as to Petitioner's trial and appellate IAC claims failed to constitute an adequate and independent procedural bar to federal review and remanded for this Court to consider the claims on the merits.  *Id.* The parties completed supplemental briefing in February 2013.  (Docs. 169, 177, 182.)  One month later, Petitioner moved to stay these proceedings pending exhaustion of a juror misconduct claim.  (Doc. 183.)

## STANDARD FOR HABEAS RELIEF

Although this case is governed by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), none of the IAC claims discussed herein were adjudicated on the merits by the state court.  Therefore, the deferential standard for relief set forth in 28 U.S.C. § 2254(d) is inapplicable, and this Court reviews Petitioner's claims *de novo*.  *See Cone v. Bell*, 556 U.S. 449, 472 (2009); *Greenway*, 653 F.3d at 800.

To prevail on an IAC claim, a petitioner must show that counsel's performance was

---

[1]     Co-defendant Lincoln was convicted of all counts and sentenced to life imprisonment.

[2]     "Doc." refers to documents filed in this Court.  For electronically-filed documents, page citation is to the ECF page number.

deficient and that the deficient performance prejudiced his defense.  *Strickland v. Washington*, 466 U.S. 668, 687–88 (1984).  To prove deficient performance, a defendant must overcome "the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* at 689.  To demonstrate prejudice, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

A court need not address both components of the *Strickland* inquiry, or follow any particular order.  If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, without evaluating counsel's performance, that should be done. *Strickland*, 466 U.S. at 697.

## DISCUSSION

### I.   IAC at Trial

Petitioner was represented at trial by Robert Benedict, against whom Petitioner alleges seven separate grounds of ineffectiveness as well as prejudice from their combined effect. Specifically, Petitioner asserts that Benedict failed to ensure adequate jury voir dire, present a reasonable theory of defense, adequately investigate and impeach Bryan Mize and Anthony Schmanski, present exculpatory evidence, adequately investigate and present a *Christensen* impulsivity defense, and request a lesser-included-offense instruction.  As to some of these allegations, Respondents assert they are outside the scope of the Ninth Circuit's limited remand.  The Court addresses each in turn.

#### A.   Voir Dire

Petitioner argues that Benedict's failure to use a juror questionnaire and to ensure that the trial court asked each of defense counsel's proposed questions was ineffective and led to the failure of a seated juror to disclose relevant information concerning her fitness to serve. Respondents contend that the claim, as now formulated, was not raised in state court and is thus not within the scope of the Ninth Circuit's remand.

The Ninth Circuit remanded this matter for consideration on the merits of claims that were presented but improperly found waived by the state court.  In state court, in an addendum to a request to file an amended state post-conviction petition, Petitioner asserted summarily that counsel was ineffective for not requesting use of a juror questionnaire. However, he did not allege prejudice from this purportedly deficient representation nor complain about any other aspect of counsel's performance during voir dire.  (Doc. 177-1 at 31.)  Petitioner's federal habeas petition mirrors his state pleading.  (Doc. 62 at 16.)  It was not until filing his supplemental brief following the Ninth Circuit's remand that Petitioner for the first time alleged that counsel's deficient performance during voir dire led to the seating of a biased juror.

The Court concludes that Petitioner's new allegations concerning the seating of a specific juror effectively state a separate claim of counsel ineffectiveness.   Petitioner concedes that the factual basis underlying this claim was known at the time he filed his federal habeas petition.  (Doc. 169 at 22 n.24.)  Pursuant to Rule 2(c) of the Rules Governing Section 2254 Cases, he was obligated to specify in his habeas petition all grounds for relief, as well as the facts supporting each of these grounds.[3]  *See Mayle v. Felix*, 545 U.S. 644, 661

---

[3]   In the context of exhaustion, federal law requires that a claim for relief include "reference to a specific federal constitutional guarantee, as well as *a statement of the facts that entitle the petitioner to relief.*" *Gray v. Netherland*, 518 U.S. 152, 162–63 (1996) (emphasis added).  To satisfy this "fair presentation" requirement, a petitioner must describe both "the operative facts and the federal legal theory on which his claim is based." *Castillo v. McFadden*, 399 F.3d 993, 998 (9th Cir. 2005).  While a petitioner may provide further facts to support a claim in federal court, this does not mean "that a petitioner who presented any ineffective assistance of counsel claim [in state court] can later add unrelated alleged instances of counsel's ineffectiveness to his claim. *Poyson v. Ryan*, No. 10-99005, 2013 WL 5943403 (9th Cir. Nov. 7, 2013) (quoting *Moormann v. Schriro*, 426 F.3d 1044, 1056 (9th Cir. 2005)); *see also Schneider v. McDaniel*, 674 F.3d 1144, 1151–52 (9th Cir.), *cert. denied*, 133 S. Ct. 579 (2012) (finding for purposes of amendment that ineffectiveness claim based on failure to establish a particular defense different in "time and type" from claim based on failure to establish different defense); *Mandacina v. United States*, 328 F.3d 995, 1002 (8th Cir. 2003) (finding for purposes of amendment that claim of failure to investigate exculpatory report different in "time and type" from claim of failure to discover exculpatory

(2005) (observing that Rule 2(c) requires pleading "separate congeries of facts" in support of each ground for relief); *Blackledge v. Allison*, 431 U.S. 63, 75 n.7 (1977) (observing that "notice" pleading in habeas is insufficient and that petition "is expected to state facts that point to a 'real possibility of constitutional error'") (quoting Advisory Committee Note to Rule 4, Rules Governing Section 2254 Cases). In *Cacoperdo v. Demosthenes*, 37 F.3d 504, 507 (9th Cir. 1994), the Ninth Circuit held that a traverse "is not the proper pleading to raise additional grounds for relief" and that issues raised for the first time in the petitioner's traverse were not properly before the district court.

Here, the Court permitted Petitioner to file a supplemental brief to address the merits of the trial and appellate ineffectiveness claims previously found to be procedurally defaulted. This was an opportunity to present additional argument and legal authority in support of existing claims, "not to raise substantively new issues or claims." *Id.* Petitioner has not sought amendment to add any of the new allegations contained in his supplemental brief. *See generally Felix*, 545 U.S. at 662–64 (holding that amended claims filed after expiration of AEDPA's limitation period must relate back to a claim raised in the original timely filed petition). Because Petitioner failed to include the supplemental brief's new factual allegations concerning voir dire in his federal habeas petition, these allegations are not properly before the Court.

Alternatively, assuming Petitioner's new allegations do not constitute a separate claim, the Court concludes that consideration of the expanded voir-dire-related ineffectiveness claim would not be outside the scope of the Ninth Circuit's remand. *See Herrington v. Cnty. of Sonoma*, 12 F.3d 901, 904 (9th Cir. 1993) (noting that "rule of mandate allows a lower court to decide anything not foreclosed by the mandate"); *Lindy Pen Co., Inc. v. Bic Pen Corp.*, 982 F.2d 1400, 1404 (9th Cir. 1993) (observing that an "order issued after remand may deviate from the mandate . . . if it is not counter to the spirit of the

---

evidence).

circuit court's decision"). The Ninth Circuit directed this Court to consider the merits of the claims raised but not considered by the state court. Petitioner raised in state court a claim alleging ineffectiveness from counsel's failure to request a juror questionnaire. Thus, assuming Petitioner's new allegations do not constitute a separate ineffectiveness claim, consideration of the expanded claim would not be "counter to the spirit of the circuit court's decision." *Lindy Pen Co.*, 982 F.2d at 1404. Accordingly, as an alternative ruling, the Court also addresses Petitioner's expanded claim on the merits.

   *Relevant Facts*

   Prior to trial, Benedict moved for individual or "small group" voir dire and filed two sets of proposed voir dire questions. (ROA at 369, 378, 389.)[4] The questions included whether any juror had ever been the victim of a crime. (*Id.* at 392.) On the first day of jury selection, the trial court denied the motion for individual voir dire, explaining that the jurors would be told to approach the bench if they had anything to state that might influence or bias other members of the venire panel. (RT 3/13/89 at 3.) The court subsequently told the panel about the role of bench conferences during voir dire and encouraged the jurors to err on the side of approaching the bench during questioning if any had concerns about speaking publically on any matter. (*Id.* at 8–9.)

   During voir dire the court asked *inter alia* whether there was anything about the nature of the case that would make it difficult to serve as a juror, whether any juror had ever been a witness or testified in a criminal case, whether any juror had ever been a witness to a criminal act where the police came out and took a statement, and whether there was anyone who for any reason or based on a question not asked could not sit as a fair and impartial juror. (*Id.* at 15–16, 55–56; RT 3/14/89 at 24.) Before the conclusion of questioning, the

---

   [4]   "ROA" refers to the consecutively-numbered pages of the record on appeal prepared for Petitioner's direct appeal (Case No. CR-89-0199-AP). "RT" refers to reporter's transcript. The original reporter's transcripts and a certified copy of the record on appeal were provided to this Court by the Arizona Supreme Court. (Doc. 64.)

court twice asked counsel if there were any particular questions either side wanted asked of the panel.  (RT 3/14/89 at 3, 24.)  Benedict requested inquiry into military service and membership in public interest groups, but otherwise believed that the court "had touched upon all of my questions."  (*Id.* at 3.)

During voir dire, juror Virginia Coker remained silent throughout initial questioning, indicating negative responses to the court's questions.  Near the conclusion of voir dire, in response to the court asking if anyone had affirmative answers to the previously asked questions, Coker asked to approach the bench and stated that she had been a witness to a domestic violence incident in her home involving her son and had called police.  (*Id.* at 18.) She assured the court this would not affect her ability to serve as a juror, and she ultimately sat on the jury.

During state post-conviction proceedings, Coker signed a declaration in December 1994 stating that she had been the "victim of a violent crime" in the early 1980s and had testified against her attacker, George Hauss, who was convicted in 1982.  (Doc. 169-1 at 113.)  Coker provided no details about the incident but, according to an appellate decision affirming Hauss's convictions, Hauss broke into the homes of ten different female victims, whom he bound, gagged, and terrorized.  *State v. Hauss*, 688 P.2d 1051, 1053 (Ariz. App. 1984).  He was known as the "foot fetish" rapist because he almost always "kissed, fondled and/or masturbated against the victims' feet."  *Id.*  Hauss was convicted of three counts of second-degree burglary, one count of aggravated assault, nine counts of kidnapping, five counts of sexual abuse, three counts of sexual assault, one count of attempted sexual abuse, and six counts of first-degree burglary.  *Id.* at 1052–53.  With respect to Coker specifically, the indictment against Hauss indicates that he was charged with committing first-degree burglary with a knife, kidnapping, and sexual assault by engaging in non-consensual sexual intercourse.  (Doc. 182-1 at 76–77.)

*Analysis*

Petitioner argues that the information about Coker likely would have been discovered

1   had Benedict asked to use a juror questionnaire or ensured that the court asked his proposed

2   question about whether any juror had ever been the victim of a crime.  He further asserts that

3   had the court learned that Coker had been the victim of a violent crime seven years before

4   Petitioner's trial, she would have been removed from the jury for cause because "it would

5   be nearly impossible for someone who was a victim of violent crime to be able to hear a case

6   involving violence against two women and remain impartial and unbiased."  (Doc. 169 at

7   24.)  The Court disagrees.

8        The conduct of voir dire "will in most instances involve the exercise of a judgment

9   which should be left to competent defense counsel." *Gustave v. United States*, 627 F.2d 901,

10  906 (9th Cir. 1980) (finding no ineffective representation where attorney did not request voir

11  dire questions requested by his client).  Counsel have wide latitude in making tactical

12  decisions and "[a] fair assessment of attorney performance requires that every effort be made

13  to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's

14  challenged conduct, and to evaluate the conduct from counsel's perspective at the time."

15  *Strickland*, 466 U.S. at 689.

16       Here, it was not objectively unreasonable for counsel to conclude that the questions

17  asked by the court were sufficient to elicit relevant information concerning the jurors'

18  experiences with crime.  The judge asked whether any juror had ever been a witness or

19  testified in a criminal case and whether any juror had ever witnessed a criminal act where the

20  police came out and took a statement.  Either of these questions should have elicited the

21  information about Coker's experience, and she further had the opportunity at the conclusion

22  of voir dire to reveal that she had been the victim of a violent crime and had previously

23  testified in court.  That she chose not to disclose this information does not support a claim

24  of ineffectiveness against trial counsel for failing to request use of a juror questionnaire or

25  to ask the judge to pose another question about jurors' experiences with crime.  *See Hovey*

26  *v. Ayers*, 458 F.3d 892, 910 (9th Cir. 2006) (rejecting claim of deficient performance

27  premised on counsel's general failure to participate actively in voir dire); *Wilson v. Henry*,

185 F.3d 986, 991 (9th Cir. 1999) (finding no ineffectiveness where counsel failed to focus on client's criminal history during voir dire and relied on jurors's statements that they would be fair and follow the law). To the extent Petitioner suggests ineffectiveness from Benedict's failure to challenge Coker for cause, the Court again finds no support for such a claim. Nothing in the record of the voir dire proceedings would have alerted a reasonable attorney to question Coker's veracity or impartiality.

Nor has Petitioner shown prejudice. First, Petitioner can only speculate that the trial court would have permitted use of a questionnaire or asked additional crime-related questions at Benedict's request, or that either of these actions would have prompted Coker to reveal her experience as a crime victim. Second, to the extent Coker's impartiality bears on the question of prejudice for the specific deficient performance alleged here, the bare fact that Coker was the victim of a crime does not establish partiality or bias per se. *See Tinsley v. Borg*, 895 F.2d 520, 527 (9th Cir. 1990) (noting that juror bias should be presumed only in "extreme" or "extraordinary" cases). The evidence proffered by Petitioner establishes that Coker testified against her assailant in 1982, seven years prior to Petitioner's trial. Nothing in Coker's declaration indicates that she was biased against Petitioner or that her experience was so similar to that of the victims in this case that there was "potential for substantial emotional involvement." *Id.* (internal citation omitted); *cf. United States v. Eubanks*, 591 F.2d 513, 516–17 (9th Cir. 1979) (presuming bias in heroin conspiracy trial where juror's sons imprisoned for heroin-related crimes). For these reasons, the Court finds no prejudice from counsel's alleged deficiencies during voir dire. *See Fields v. Brown*, 431 F.3d 1186, 1199 (9th Cir 2005) (finding no prejudice from failure to ask follow-up questions concerning past assault on seated juror's wife where juror was not biased).

## B.   Theory of Defense

Petitioner argues that Benedict failed to present a reasonable theory of defense in his opening statement and closing argument and that he should have pursued a *Christensen*

defense.[5]  Respondents contend that the "closing argument" and *Christensen* allegations were never presented in state court and are outside the scope of the Ninth Circuit's remand.  A review of the state pleadings supports Respondents' position. (*See, e.g.*, Doc. 177-1 at 26–31.)  Although Petitioner asserted in his federal habeas petition that defense counsel failed to "present any coherent summary of a defense on behalf of Petitioner" or "to adequately investigate a potential *Christensen* defense" (Doc. 62 at 16–17), those specific allegations of ineffectiveness were not presented in any of Petitioner's state court post-conviction pleadings.[6]

It thus appears that the closing argument and *Christensen* allegations fall outside the scope of the Ninth Circuit's mandate because neither are within the group of claims found waived by the state court.  Nevertheless, other grounds may justify consideration of these claims.  Since this Court's procedural bar ruling in July 2000, the law governing "cause and prejudice" to excuse a procedural default has changed significantly.  In its ruling, the Court determined based on then-governing law that the ineffective assistance of post-conviction counsel could not constitute cause for any procedural default of Petitioner's habeas claims (either for claims the state court found waived or for claims, such as those alleged here, that were never raised in state court).  (Doc. 65 at 10–11.)  However, in *Martinez v. Ryan*, 132 S. Ct. 1309, 1315 (2012), the Supreme Court held that "[i]neffective assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance of trial."  Assuming without deciding that reconsideration of this aspect of the Court's procedural bar ruling would not be "counter to the spirit of the

---

[5]    *State v. Christensen*, 628 P.2d 580 (Ariz. 1981).

[6]    In one state filing, Petitioner asserted counsel's ineffectiveness for *not requesting funding to hire experts* to provide "the information necessary to make decisions regarding potential defenses (Christensen)."  (Doc. 171-1 at 28.)  However, this differs considerably from the claim set forth in the federal habeas petition, which alleges that a pretrial psychological examination of Petitioner by Dr. Ronald David should have put counsel on notice of a potential *Christensen* defense.  (Doc. 62 at 16.)

circuit court's decision," *Lindy Pen Co., Inc.*, 982 F.2d at 1404, the Court will address on the merits the entirety of Petitioner's allegations concerning counsel's theory of defense. *Cf. Detrich v. Ryan*, No. 08-99001, 2013 WL 4712729 (9th Cir. Sep. 3, 2013) (en banc) (remanding to district court for reconsideration of procedurally defaulted IAC claims in light of *Martinez*).

*Relevant Facts*

In his opening statement, Benedict told the jury that the case "is not really a what happened case, it is a who done it" and suggested that the murders could have been committed by one person, not two. (RT 3/14/89 at 63.) Anticipating the State's fingerprint evidence linking Petitioner to the rifle found in the vicinity of co-defendant Lincoln's home, Benedict asserted that such evidence "simply says that at some point in time Mr. Greenway may have handled that rifle." (*Id.* at 64.) Benedict also criticized the expected testimonial evidence of statements made by Petitioner, telling the jury that such evidence is "very dangerous" because it depends on the accuracy of the person testifying, is "strained through human memory," and is inaccurate and unreliable. (*Id.* at 65.)

The evidence at trial established that Lili Champagne had been shot in the forehead between her eyes and in the back of her left knee. A pillow near Lili's body contained gunshot residue, and fabric particles consistent with the pillow's lining were found in her forehead wound. Lili's daughter, Mindy, was shot twice in the head; a small towel covered part of her face. A spent .22 shell casing was found in the victims' garage, and the home's entertainment equipment was missing.

A search of Petitioner's home uncovered the keys to the burned and abandoned Porsche. Searches of co-defendant Lincoln's and his mother's homes produced ammunition identical to that used in the homicides and a portable stereo belonging to the victims. In a storage shed used by Lincoln police found various pieces of the victims' stereo equipment as well as a .22 caliber rifle. Ballistics testing revealed that the shell casing found in the victims' garage had been chambered in the seized weapon. Petitioner's fingerprints were

found on the stock of the rifle, on the outside driver door of the Porsche, and on some of the Champagnes' stereo equipment.  Co-defendant Lincoln's fingerprints were found on the stock of the rifle, on the stolen car's passenger door, and on a stereo receiver.

A Sheriff's officer testified regarding operation of the murder weapon, which he described as a magazine-fed, bolt-action rifle.  Individual bullets from the magazine are moved into the firing chamber by manually moving the bolt forward.  Once a bullet is fired, "you then now have to take the bolt, pull it back, which ejects or throws out the spent bullet, throws it out on the ground . . . Then you have to take it, put it forward and drop the bolt back in place again" to put another bullet in the chamber ready for firing.  (RT 3/14/89 at 125.)

The evidence at trial also established that Petitioner's sister, Sandra Weese, called police to report Petitioner's and Lincoln's involvement after seeing a publicized request for information concerning the victims and the Porsche.  Weese had seen Petitioner the night before in a small white sports car and recognized the name of the victim, Mindy Peters.  Several months before the murders, in late December 1987, Weese had lent Petitioner her car and later her son found Mindy's wallet under one of the car seats.  According to Mindy's friend, Lisa Smolic, she and Mindy met Petitioner in December 1987 at a fast-food restaurant.  They hung out for a while at his place, and he later drove them each home.  She recalled that Mindy lost her wallet on this occasion and that Petitioner later returned it.  Smolic also testified that Mindy and Petitioner were friendly and that they went together to a party in early 1988.

Following his arrest, Petitioner was placed in a jail cell with Anthony Schmanski.  At trial Schmanski testified that in response to his asking Petitioner why he was in jail, Petitioner said, "Well, I just blew two people away."  (RT 3/15/89 at 70.)  When asked why, Petitioner responded that they had seen his face.  According to Schmanski, Petitioner said that he went to the victims' house to burglarize it and that he stole a VCR, television, and Porsche.

Petitioner also made statements about the offense to a co-worker, Bryan Mize.  Mize

testified that on the morning before Petitioner's arrest, Petitioner offered to sell Mize an expensive car stereo and speakers that he told Mize were stolen from a Porsche.  According to Mize, Petitioner said that he and a friend broke into the home of a girl with whom Petitioner had once gone out and driven home.  Petitioner told Mize that they made sure the victims were in the same room, broke in through the garage, and took some stuff out of the house, including a VCR.  Petitioner also told Mize that he shot the victims after sending his friend out of the room and, while pointing to his own forehead, said blood gushed out of the "older lady."  Mize testified that Petitioner said he had been planning for two weeks to go the victims' house, that he wore surgical gloves, and that he and Lincoln torched the white Porsche after cruising around and then going to Petitioner's sister's house to get Petitioner's car.

The defense called several witnesses at trial.  Petitioner's former supervisor testified that Petitioner was a non-violent individual.  A friend of Bryan Mize testified that Mize once stole his VCR and lied about it.  Anthony Schmanski's probation officer testified that Schmanski had an alcohol problem.

In his closing argument, defense counsel Benedict returned to the two types of evidence referenced in his opening statement.  First, he discussed the fingerprint evidence, emphasizing that Petitioner's print was found only on the stock of the weapon, not the trigger.  He also argued that Petitioner's prints were on the Porsche and stereo equipment because Petitioner had helped co-defendant Lincoln dispose of the property.

Second, Benedict addressed Petitioner's statements to Schmanski and Mize.  He argued that Schmanski was unreliable because he "[is] a dedicated alcoholic, someone who has been drinking all his life, someone who is in the psychiatric wing of the jail, someone who did not want to be in jail, someone who wanted a deal but didn't get it."  (RT 3/16/89 at 94.)  Regarding Mize, Benedict posited the question "Why would [Greenway] do this, why would he make these statements that are so, you know, out of their character, they are so much against your interest?  Why would you make a statement like this?"  (*Id.* at 95.)  In

answer, Benedict told the jury that Petitioner didn't make the statements and that Mize was lying.  Benedict suggested the possibility that Mize, who was friends with co-defendant Lincoln, heard the story from Lincoln and misunderstood it or that Mize was trying to protect Lincoln.  Counsel also pointed out that Mize was an unemployed 23-year-old and that the jury lacked enough information about him to base a life-altering decision on his testimony.

*Analysis*

Counsel has a duty to make a reasonable investigation or to make a reasonable decision that makes particular investigations unnecessary.  *Strickland*, 466 U.S. at 691.  Reasonableness requires more than just a cursory investigation.  *See Rios v. Rocha*, 299 F.3d 796, 806–06 (9th Cir. 2002) (stating that counsel must interview more than one witness before abandoning a particular defense).  After investigating relevant defenses, counsel also must reasonably select and present a defense at trial.  *Phillips v. Woodford*, 267 F.3d 966, 980 (9th Cir. 2001).  Thus, even if counsel conducts a reasonable investigation, counsel may still act unreasonably in selecting the defense to present at trial.  *Mickey v. Ayers*, 606 F.3d 1223, 1236 (9th Cir. 2010).

Petitioner argues that Benedict's opening statement failed to provide any theory of defense to the jury and unreasonably suggested that Petitioner actually made the statements about which witnesses would testify.  He further argues that Benedict's closing argument "simply reinforced the fact that he had failed to develop a reasonable theory of defense." (Doc. 169 at 25.)  Finally, he asserts that Benedict failed to investigate, develop, and present a *Christensen* impulsivity defense.

Petitioner's arguments notwithstanding, Benedict did present a coherent two-fold theory of defense.  First, he suggested that Lincoln, not Petitioner, had committed the offense and that Petitioner simply helped dispose of the victims' property afterward.  Second, he asserted that the prosecution had failed to meet its high burden of proving the case beyond a reasonable doubt.  Neither of these theories was unreasonable given the alternative theories of first degree murder pursued by the prosecution and the strong evidence of Petitioner's

involvement, both of which limited counsel's strategic options.

Petitioner was charged with first degree murder based on two theories: (1) that he premeditated the deaths of the victims ("premeditated murder"); and (2) that he caused the deaths of the victims in the course of and in furtherance of committing burglary or robbery ("felony murder").[7] Even without the statements of Mize and Schmanski, the direct and circumstantial evidence established that Petitioner knew one of the victims, knew where she lived, was seen driving the victims' Porsche, had the stolen vehicle's keys in his home, and left fingerprints on the Porsche, the victims' stereo equipment, and the murder weapon. Reasonable counsel would have known that these uncontroverted facts provided sufficient evidence from which a jury could, at a minimum, find guilt under a felony murder theory. Benedict also had to deal with the evidence of Petitioner's statements to Mize and Schmanski, both of which were highly inculpatory and supported a finding of premeditation. In light of this evidence, the Court finds that Benedict made a reasonable strategic decision to focus the jury's attention on the unreliability of witness testimony recounting another's statements and on the possibility that Petitioner handled the stolen property only after Lincoln committed the crimes.

Petitioner argues that Benedict ignored signs of a potential impulsivity defense. Specifically, he contends that counsel should have investigated and presented a defense under *State v. Christensen*, 628 P.2d 580 (Ariz. 1981), on the basis of Petitioner's "impulsive behavior and limited capacity." (Doc. 169 at 45.) He argues that such evidence would have lessened Petitioner's culpability for the crime. However, because evidence of "limited capacity" is not admissible under Arizona law, *Christensen* provides no defense to felony murder. Furthermore, there was little evidence to suggest the murders were committed

---

[7]     The verdict form used at trial did not require the jury to indicate which theory formed the basis of their first degree murder verdict. *See generally Schad v. Arizona*, 501 U.S. 624, 639–45 (1991) (finding no due process violation from instructions that did not require jury to agree unanimously on alternative theories of premeditated and felony murder).

reflexively, and an impulsivity defense would have conflicted with counsel's chosen strategy of casting Lincoln as the sole perpetrator of the burglary, robbery, and murders.

It is settled that "Arizona does not allow evidence of a defendant's mental disorder short of insanity either as an affirmative defense or to negate the *mens rea* element of a crime." *State v. Mott*, 931 P.2d 1046, 1051 (Ariz. 1997).  Simply put, a defendant cannot present evidence of mental disease or defect to show that he lacked the capacity to form the requisite mental state for a charged offense.  *Id.* at 1050; *see Clark v. Arizona*, 548 U.S. 735 (2006) (upholding the constitutionality of the *Mott* rule and finding that the exclusion of expert testimony regarding diminished capacity does not violate due process).  Because Benedict was precluded under state law from presenting evidence of Petitioner's alleged "limited capacity," the failure to investigate and pursue such evidence was neither deficient nor prejudicial.

Arizona law does permit a defendant to present evidence that he has a *character trait* for acting reflexively, rather than reflectively.  *See Christensen*, 628 P.2d at 583–84; *Vickers v. Ricketts*, 798 F.2d 369, 371 (9th Cir. 1986).  In *Christensen*, the defendant sought to admit expert testimony regarding his tendency to act without reflection.  The Arizona Supreme Court held it was error to exclude such testimony because "establishment of [this character trait] tends to establish that appellant acted impulsively.  From such a fact, the jury could have concluded that he did not premeditate the homicide." *Christensen*, 628 P.2d at 583.  However, the *Christensen* rule is limited in that an expert cannot testify as to whether the defendant was acting impulsively at the time of the offense.  *Id.* at 583–84; *see also State v. Arnett*, 760 P.2d 1064, 1071 (Ariz. 1988) (emphasizing that although expert testimony is admissible to establish personality trait of acting without reflection, testimony of a defendant's probable state of mind at time of the offense is not permitted).  Perhaps even more importantly for this case, the *Christensen* rule is also limited to the presentation of evidence to negate premeditation, not any other culpable states of mind.

- 16 -

In Arizona, felony murder "requires no specific mental state other than that which is required for the commission of any of the felonies enumerated in the statute." *State v. Woratzeck*, 657 P.2d 865, 868 (Ariz. 1982); A.R.S. § 13-1105(B) (West 1978).  Here, Petitioner was charged with first degree burglary and armed robbery as predicate felonies for felony murder.  *See* A.R.S. § 13-1105(A)(2) (West 1978).  As instructed by the trial court, proof of first degree burglary required a finding of intent to commit theft or any other felony within an unlawfully entered residential structure while knowingly possessing a deadly weapon.  (RT 3/16/89 at 78.)  The jury was instructed that the crime of armed robbery required, among other things, a finding of intent to coerce surrender of property from a person or that person's immediate presence.  Neither burglary nor robbery require a showing of premeditation.  Consequently, presentation of a so-called "*Christensen* defense" would have provided no defense to felony murder.

Moreover, pursuit of an impulsivity defense would have conflicted with the theory that Lincoln acted alone and that Petitioner handled the victims' property only after the offense.  Under *Christensen*, Benedict could have presented evidence that Petitioner had a "proneness to impulsive reactions." (Doc. 169 at 44, 46.)  However, doing so would have essentially admitted Petitioner's involvement in the crimes.  Petitioner argues otherwise, pointing out that *Christensen* prohibits expert testimony about a defendant's probable state of mind at the time of the offense.  However, presenting evidence that Petitioner has a character trait of impulsivity would have suggested to the jury that Petitioner must have been in the victims' home and that the murders were the result of a reflexive, not reflective, act.  Such a defense would have been at odds with Benedict's chosen strategy of denying Petitioner's involvement altogether.  Furthermore, as already noted, impulsivity was not a viable defense against the felony murder theory or its predicate felonies.  Thus, Benedict was not ineffective for failing to further investigate Petitioner's impulsive character and declining to pursue inconsistent defenses. *See Mickey*, 606 F.3d at 1237–38 (finding no duty to further

investigate once counsel reasonably selected between two available but conflicting defenses); *Turk v. White*, 116 F.3d 1264, 1267 (9th Cir. 1997) (same); *see also Nelson v. Nagle*, 995 F.2d 1549, 1554 (11th Cir. 1993) (finding no ineffectiveness for declining to pursue inconsistent defenses of intoxication and innocence).

Finally, the failure to pursue impulsivity as a defense was not ineffective because there was no evidence that the killings were impulsive. *Cf. Moormann v. Ryan*, 628 F.3d 1102, 1108–09 (9th Cir. 2010) (finding no ineffectiveness for failing to present impulsivity defense where evidence of planning did not support such a defense); *LaGrand v. Stewart*, 133 F.3d 1253, 1272 (9th Cir. 1998) (same). Rather, the evidence strongly suggested that Petitioner acted with premeditation.

In Arizona, a defendant kills with premeditation if he "acts with either the intention or knowledge that he will kill another human being, when such intention or knowledge precedes the killing by a length of time to permit reflection." A.R.S. § 13-1101(1) (West 1978). "An act is not done with premeditation if it is the instant effect of a sudden quarrel or heat of passion." *Id.*

The evidence here established that the bullet shot into Lili Champagne's forehead traveled through a pillow. This suggests an intent to either muffle the sound of the shot or cover the victim's face during the shooting, either of which is evidence of planning and reflection. Similarly, the fact that there were two victims and each was shot twice with a weapon that required manual reloading of each bullet shows that the shooter had sufficient time to reflect on his actions as he readied the weapon between shots. Although one of the shell casings was found in the victims' garage, none were found in the house, indicating they were purposefully collected. There was no evidence of a struggle at the crime scene, and neither of the witnesses who testified regarding statements made by Petitioner said that he described being surprised by the victims or having some other basis for acting reflexively when they were shot. To the contrary, Petitioner told Bryan Mize that he knew the women

were at home and made sure they were in the same room before breaking in.  Petitioner also told Mize that he had been planning for two weeks to go to the victims' house, wore surgical gloves during the offense, and removed items from the house before shooting the women. This was clear evidence of planning and reflection.  Finally, Petitioner told Anthony Schmanski that he killed the victims because they had seen his face, again demonstrating reflection preceding the shootings.  Simply put, counsel was not ineffective for failing to pursue an implausible impulsivity defense. *See Williams v. Woodford*, 384 F.2d 567, 610–11 (9th Cir. 2004) (holding that counsel need not put on an unpersuasive defense).

Even assuming deficient performance for failing to investigate or present an impulsivity defense, the Court finds no prejudice.  No expert would have been allowed to testify that Petitioner was acting impulsively at the time of the murders.  *Christensen*, 628 P.2d at 583–84.  Rather, the testimony "would have been limited to a general description of [Petitioner's] behavioral tendencies." *Summerlin v. Stewart*, 341 F.3d 1082, 1095 (9th Cir. 2003) (en banc), *rev'd on other grounds,* 542 U.S. 348 (2004).[8]  As such, it would have had little or no probative value in determining whether Petitioner lacked premeditation at the time of the offense, particularly given the absence of evidence suggesting the killings were the result of an impulsive act.  More critically, there was compelling evidence to support the State's felony murder theory, against which an impulsivity defense would have had no

---

[8]     The Court notes that much of the evidence Petitioner claims Benedict should have uncovered likely would not have been admissible under *Christensen*.  The "deficits" and "brain damage" Petitioner references appear to be more indicative of diminished capacity, than a character trait of acting without reflection.  *See Christensen*, 628 P.2d at 582 (finding error for precluding expert psychiatric testimony that defendant "had difficulty dealing with stress and in stressful situations his actions were more reflexive than reflective").  Indeed, Petitioner describes his expert reports as evidence of "limited mental capacity."  (Doc. 182 at 30–31.)  However, because there is little evidence that the murders were the result of an impulsive act and *Christensen* is irrelevant to felony murder, the Court need not determine whether the evidence relied on by Petitioner here would have been admissible under state law.

relevancy.   "In the face of this evidence, [the Court does] not see what counsel might have done that with reasonable probability would have changed the verdict." *U.S. ex rel. Simmons v. Gramley*, 915 F.2d 1128, 1135 (7th Cir. 1990) (citation omitted).

In sum, other than pursuing a *Christensen* defense, Petitioner does not suggest any alternative theories of defense that Benedict could and should have pursued.  Because there was compelling evidence to support the State's felony murder theory, it was not objectively unreasonable for counsel to focus on raising a reasonable doubt about Petitioner's involvement in the crimes and casting blame on co-defendant Lincoln rather than pursuing an impulsivity defense that was inapplicable to the felony murder theory, unsupported by the evidence, and inconsistent with counsel's chosen strategy.  Petitioner has failed to overcome the presumption of effective performance by demonstrating that Benedict's actions were not within the domain of acceptable trial strategy.  Even assuming deficient performance, there is no reasonable probability the jury would have acquitted Petitioner of first degree murder had Benedict introduced evidence of an impulsive personality.

### C.    Lesser-Included Offense

Petitioner alleges that Benedict acted unreasonably in failing to request a jury instruction on second degree murder as a lesser-included offense of premeditated murder.  Respondents contend that the claim, as now formulated, was not raised in state court and is thus not within the scope of the Ninth Circuit's remand.  The Court agrees.

Nowhere in either his state court pleadings or his federal habeas petition did Petitioner assert that counsel was ineffective for failing to request a lesser-included-offense instruction.  Rather, Petitioner alleged only that counsel failed to advise "Petitioner of the benefits of asking for lessors."  (Doc. 62 at 15; Doc. 177-1 at 8.)  These are two factually distinct allegations of ineffectiveness—the first asserts a failure to request an instruction from the trial court and the second asserts a failure to properly advise Petitioner. *See Strickland*, 466 U.S. at 690 (stating that an IAC claim must identify particular acts or omissions of counsel);

*Moormann*, 426 F.3d at 1056.  Because Petitioner's federal habeas petition does not allege ineffectiveness based on counsel's failure to request a jury instruction on lesser-included offenses, this claim is not properly before the Court.  Alternatively, and assuming the Court has jurisdiction to consider the claim, the Court finds that the claim lacks merit.

*Relevant Facts*

After the prosecution rested, the trial court and counsel for the parties recessed to the judge's chambers to review and settle jury instructions.  (RT 3/15/89 at 113.)  That discussion took place outside the presence of a court reporter.  The next day, following the close of evidence, the prosecutor made the following record concerning jury instructions:

> Judge, the only record I had is, we had some informal conversations yesterday settling instructions, and I would like to make it a matter of record we talked about the possibility of a lesser, and two things are clear.  One, there is no evidentiary basis for giving them, and, two, Mr. Benedict stated at that time that his client, Mr. Greenway, did not want a lesser included and wanted the jury instructed on first degree murder or not guilty, and I just wanted that to be part of the record.

(RT 3/16/89 at 71.)  Benedict did not contradict the prosecutor's recitation of what occurred in chambers and made his own record by objecting to various other instructions.  (*Id.* at 71–72.)

*Analysis*

A defendant has a due process right to a lesser-included-offense instruction when the evidence warrants such an instruction.  *Hopper v. Evans*, 456 U.S. 605, 611 (1982); *Beck v. Alabama*, 447 U.S. 625, 637–38 (1980).  A lesser-included-offense instruction is warranted if "there was evidence which, if believed, could reasonably have led to a verdict of guilt of a lesser offense."  *Hopper*, 456 U.S. at 610.  "The decision not to request a lesser included offense instruction falls within the wide range of reasonable professional representation." *Woratzeck v. Ricketts*, 820 F.2d 1450, 1455 (9th Cir. 1987), *vacated on other grounds*, 486 U.S. 1051 (1988); *see also Clabourne v. Lewis*, 64 F.3d 1373, 1382–83 (9th Cir. 1995) (analyzing failure to request jury instruction as tactical decision by counsel).

Under Arizona law, there is no lesser-included offense for felony murder. *See State v. Celaya*, 660 P.2d 849, 856 (Ariz. 1983) (citation omitted). However, second degree murder is a lesser-included offense of premeditated first degree murder. The distinction between first and second degree murder is the element of premeditation. *Christensen*, 628 P.2d at 583. A defendant kills with premeditation if he "acts with either the intention or the knowledge that he will kill another human being, when such intention or knowledge precedes the killing by a length of time to permit reflection. An act is not done with premeditation if it is the instant effect of a sudden quarrel or heat of passion." A.R.S. § 13-1101(1) (West 1978).

At trial, no evidence was presented that would have allowed a jury rationally to convict Petitioner of second degree murder while acquitting him of first degree murder. The evidence that two victims were shot multiple times with a weapon that required reloading between shots, along with the other evidence demonstrating that Petitioner knew where the victims lived and planned his actions, precluded a rational juror from finding that Petitioner committed the murders without premeditation or because of a sudden quarrel or heat of passion. *See Cook v. Schriro*, 538 F.3d 1000, 1023–24 (9th Cir. 2008); *Clabourne*, 64 F.3d at 1381. In addition, Petitioner's defense was not that he killed the victims without premeditation, but that he was not present when they were shot. Finally, Petitioner himself did not want a lesser-included instruction. Under these circumstances, Petitioner was not entitled to a second degree murder instruction and counsel was not ineffective for failing to request one.

### D.   Bryan Mize

Petitioner alleges three separate grounds of counsel ineffectiveness relating to prosecution witness Bryan Mize. First, Petitioner asserts that Benedict failed to conduct an adequate background investigation of Mize. Second, Petitioner contends that Benedict should have moved to withdraw after Mize told detectives that Benedict had threatened him

during a pretrial interview.  Third, Petitioner argues that Benedict was ineffective for calling Zane Vogann as a witness to impeach Mize.  Respondents contend that only the first claim is properly before the Court.  A review of the amended petition supports Respondents' position.

In his amended habeas petition, Petitioner argued that Benedict was ineffective for failing to interview Mize prior to trial and failing to "locate neighbors, friends or co-workers who could educate the defense about [Mize] and [his] reputation for truthfulness or lack of truthfulness.  (Doc. 62 at 12.)  He did not assert that Benedict should have moved to withdraw due to circumstances related to Benedict's pretrial interview of Mize or that Benedict should not have called Vogann as a witness.  Petitioner clearly was aware of the factual basis of these claims when he filed the amended habeas petition, yet did not include them.  Because these IAC claims were raised for the first time in the post-remand supplemental merits brief and Petitioner has not sought leave to amend, they are not properly before the Court and will not be considered.  *See Cacoperdo*, 37 F.3d at 507.  The Court turns now to the only Mize-related IAC claim raised in the amended petition, found barred by this Court, and remanded by the Ninth Circuit for consideration on the merits.

Petitioner argues that Benedict failed to conduct an adequate background investigation regarding Mize's criminal history.  At trial, when asked by the prosecutor whether he had ever been convicted of a felony offense, Mize testified, "I'm not too sure if I have or not.  I have got a DWI." (RT 3/14/89 at 164.)  Although not alleged in his habeas petition, Petitioner now asserts that an adequate investigation would have revealed that Mize was charged with manslaughter in connection with the DWI because a passenger in the truck Mize was driving died after Mize ran off the road.  (Doc. 169 at 28.)  He further asserts that Benedict would have learned that Mize "pleaded guilty to a felony in exchange for being discharged from the military."  (*Id.* at 28-29.)  In Petitioner's view, both of these facts could have been used to impeach Mize's credibility.  (*Id.* at 28-29.)

1    *Relevant Facts*

2      Benedict and his investigator, Robert Annenberg, traveled to Kansas City in early

3 November 1988 to interview Mize. (ROA at 219–28, 237–42.) Benedict interviewed Mize

4 a second time on the first day of trial. (ROA at 533.) Prior to trial, the prosecutor's office

5 sent Benedict a letter indicating that Mize had no prior felony convictions. (Doc. 169-2 at

6 135.)

7      In preparation for these habeas proceedings, Petitioner's counsel reviewed the

8 prosecutor's file and discovered a National Crime Information Center (NCIC) report on

9 Mize. (Doc. 167 at 2.) The report indicated that Mize was arrested in Missouri for

10 involuntary manslaughter in 1987 and also referenced a military criminal charge. (Doc. 169-

11 1 at 145.) After further investigation, habeas counsel obtained records concerning the 1987

12 DWI and manslaughter charges (Doc. 169-1 at 133–43; Doc. 182-1 at 79–85), as well as

13 military records indicating that in 1986 Mize agreed to a voluntary discharge from the

14 military in lieu of court martial for being absent without leave. (Doc. 182-1 at 19–35.)

15      The newly-uncovered Missouri records indicate that Mize was arrested for driving on

16 the wrong side of the road, driving while intoxicated, and involuntary manslaughter. (Doc.

17 169-1 at 134.) At the time of his arrest, he was "in great pain and hysteria due to his serious

18 injuries" and repeatedly screamed, "'I don't want to die' and 'I hope that everyone can

19 forgive me for what I've done.'" (Doc. 169-1 at 134.) The next day when he was

20 interviewed by police, Mize said he had no memory of the accident. (*Id.*) He ultimately

21 plead guilty to two misdemeanors and was fined. (Doc. 182-1 at 79–80, 84–85.) Although

22 he made some partial payments, Mize was several times charged with contempt for failing

23 to pay the full fine, plead guilty to contempt on one occasion, and served one day in jail. (*Id.*

24 at 80–81, 84–85.)

25      *Analysis*

26      Respondents contend that evidence of Mize's arrest for involuntary manslaughter

27

28

would not have been admissible at trial to impeach Mize because the arrest did not lead to a felony conviction and, under Arizona law, a witness "may not be impeached by specific acts of misconduct not amounting to a conviction for a felony." (Doc. 177 at 8.) Petitioner counters that, although Benedict may not have been able to impeach Mize under Rule 609 of the Arizona Rules of Evidence with the fact he was arrested for manslaughter,[9] he could have cross-examined Mize under Rule 608(b) about Mize's "false and misleading statements to the police" during the DWI investigation.[10] (Doc. 182 at 15.) Specifically, Petitioner argues that because Mize had "asked that he be forgiven" at the time of the accident, Benedict could have asked Mize to admit that he lied to police when he claimed lack of memory the day after the accident. (*Id.* at 16.) Petitioner also asserts that Benedict could have cross-examined Mize about his "broken promises" to the Missouri court to pay his fine and about Mize's failure to "obey all lawful orders" while in the military. (*Id.* at 16, 19.)

Petitioner's allegations are wholly without merit. First, the prosecutor (accurately) informed Benedict that Mize had no felony convictions. Therefore, it was not objectively unreasonable to forgo further investigation of Mize's misdemeanor DWI or military discharge to search for impeachment evidence. Second, Petitioner has not identified evidence that would have been admissible even had Benedict conducted a more thorough investigation. Petitioner only speculates that Mize lied to police during the DWI investigation. In addition, nothing about Mize's failure to pay a fine evinces a character for untruthfulness such that the trial court would have permitted cross-examination on this

---

[9]     Arizona law precludes use of a prior conviction involving a sentence of imprisonment less than one year, unless the crime "involved dishonesty or false statement." Ariz. R. Evid. 609 (West 1988).

[10]     Notwithstanding Rule 609, Arizona law permits, in the discretion of the trial court, inquiry during cross-examination of specific instances of conduct that are probative of a witness's character for truthfulness or untruthfulness. Ariz. R. Evid. 608(b) (West 1988).

ground under Rule 608(b). The same is true for Mize's discharge from the Army "for the good of the service" in lieu of court-martial for being absent without leave. *See, e.g.*, *State v. Ferguson*, 717 P.2d 879, 889–90 (Ariz. 1986) (observing that court-martial for being absent without leave does not involve "dishonesty or false statement" under Ariz. R. Evid. 609).

Finally, even assuming the alleged impeachment evidence would have been admitted, there is no reasonable probability of a different outcome. Mize gave a comprehensive statement to police just one day after the victims' bodies were discovered. (Doc. 169-1 at 120–29.) He provided details of the murders that were readily corroborated by other evidence. For example, Mize told police that Petitioner said he had stolen a Porsche and other stuff (including a VCR) from the home of a woman and her daughter, that he had gone out with the daughter, that the older woman was shot in the forehead, and that he burned the Porsche after first retrieving his own car. (*Id.* at 122–28.) Given the consistency between the details relayed by Mize and the offense, Petitioner cannot show prejudice from counsel's alleged failure to investigate and attempt to impeach Mize with the circumstances surrounding Mize's DWI and military discharge.

### E.    Anthony Schmanski

Anthony Schmanski shared a cell with Petitioner following Petitioner's arrest. Schmanski had been arrested for violating conditions of probation imposed following a conviction for endangerment. Schmanski testified at trial that Petitioner said he was in jail because "I just blew two people away." (RT 3/15/89 at 70.) Schmanski also testified that Petitioner said he had taken a VCR, television, and Porsche; that he went to the victims' home to burglarize it; and that he had killed the women because they had seen his face. (*Id.* at 71-73.)

As with Mize, Petitioner asserts that Benedict failed to conduct a sufficient background investigation of Schmanski. He asserts that a more thorough investigation would

have uncovered the following:  (1) Schmanski was discharged from the military in 1946 for "bad conduct"; (2) Schmanski's endangerment conviction was based on threatening someone with a gun at an airport, and when arrested Schmanski stated, "I should have blown him away"; and (3) Schmanski was once charged with domestic violence for hitting his children. Petitioner does not assert in his merits brief that this information could have been used to impeach Schmanski during trial.[11]  (Doc. 169 at 34.)  Rather, he argues that Benedict "could have used this information to his advantage when questioning Schmanski during the pretrial interview to catch Schmanski in a lie or to discount Schmanski's use of the phrase blowing people away."  (*Id.*)  This is nothing more than speculation and is plainly insufficient to demonstrate prejudice from Benedict's allegedly deficient investigation.  *See Wood v. Bartholomew*, 516 U.S. 1 (1995 ) (per curiam); *Gonzalez v. Knowles*, 515 F.3d 1006, 1016 (9th Cir. 2008) (speculation insufficient to establish prejudice).

Petitioner also complains that Benedict unreasonably failed to use information about Schmanski that he had uncovered.  For example, Petitioner faults Benedict for not questioning Schmanski's probation officer about whether Schmanski was delusional at the time of his arrest for endangerment and for not calling as a witness Janette Kibbey, who told Benedict's investigator that Schmanski had been her tenant for over two years and was an alcoholic "whose actions are questionable and whose word cannot always be relied upon." (ROA at 284; Doc. 169-2 at 64.)  Petitioner also asserts for the first time in his merits brief that Kibbey's daughter, Charlene Maynard, would have testified that Schmanski was a

---

[11]  Although not argued in his merits brief, Petitioner does assert in his reply brief that Benedict could have cross-examined Schmanski under Ariz. R. Evid. 608(b) about being disciplined twice for possessing another person's clothes and receiving a court martial and discharge for repeated absences without leave.  (Doc. 169-1 at 177, 183, 211-14.)  This "misconduct" occurred in the early 1940s, more than 40 years before Schmanski testified in this case.  As with Mize's discharge from the military, the Court concludes there is no reasonable probability the trial court would have found these acts to be probative of Schmanski's truthfulness or otherwise permissible areas of cross-examination under Rule 608(b).

"drunk and liar." (Doc. 169-2 at 60.)  Even assuming Benedict's performance was deficient (despite the investigation undertaken both by counsel and his investigator), Petitioner cannot establish prejudice.

During cross-examination, Benedict elicited from Schmanski that he is a life-long drinker; that he was in the psychiatric section of the jail when he was first arrested for violating conditions of probation; that he did not want to be in jail; that he did not report Petitioner's inculpatory statement until after talking to his wife, getting released from jail on bond, and reading newspaper articles about the crime; and that he hoped his cooperation in Petitioner's case would help with problems he was having with his probation officer.  (RT 3/15/89 at 77-83, 90.)  The fact that Schmanski was in jail at the time of the conversation with Petitioner and hoped to garner favor by cooperating with the prosecution already raised questions about his credibility.  More critically, in light of the totality of the evidence implicating Petitioner in the offense, there is no reasonable probability he would not have been convicted had Benedict called Kibbey or Maynard as witnesses to impeach Schmanski's credibility or questioned Schmanski's probation officer concerning Schmanski's alleged delusional state of mind at the time of his arrest for endangerment.[12]

## F.   Exculpatory Evidence

Petitioner alleges that Benedict was ineffective for failing to locate and call as a witness Darrin Saige, who had been housed at the Pima County Jail with co-defendant Lincoln.  Prior to trial, defense investigator Annenberg interviewed Saige, who claimed that Lincoln told him three different versions of events, the first two implicating Petitioner in the burglary and homicide and the last implicating Petitioner only in the arson of the Porsche.  (Doc. 169 at 38.)  One week before trial, Annenberg was unable to locate Saige.  (*Id.*) Petitioner argues that Benedict should have sought a trial continuance and made additional

---

[12]      Police records indicate that Schmanski was intoxicated when he threatened two individuals with a gun in an airport parking lot.  (Doc. 169-2 at 4, 10, 11, 15.)

efforts to locate Saige.  (*Id.* at 39.)  Respondents counter that this claim is not properly before the Court because it was raised in neither state court nor the federal habeas petition.  (Doc. 177 at 31.)  The record supports Respondents' position.

In his amended habeas petition, Petitioner raised numerous allegations of counsel ineffectiveness.  (Doc. 62 at 11–17.)  He did not, however, assert that Benedict was ineffective for failing to expend sufficient efforts or to request a trial continuance to locate Saige.  Petitioner was aware of the factual basis of this claim when he filed the amended petition, yet did not include it.  Because this IAC claim was raised for the first time in the post-remand supplemental merits brief and Petitioner has not sought leave to amend, it is not properly before the Court and will not be considered.  *See Cacoperdo*, 37 F.3d at 507.

## G.    Cumulative Effect

Petitioner asserts that he was prejudiced by the cumulative effect of Benedict's alleged errors.  A petitioner may prove that he has suffered ineffective assistance of counsel based on the cumulative effect of errors.  *See Phillips v. Woodford*, 267 F.3d 966, 985 (9th Cir. 2001).  In evaluating such a claim, a court must ask whether the "multiple deficiencies have the cumulative effect of denying a fair trial to the petitioner."  *Ewing v. Williams*, 596 F.2d 391, 396 (9th Cir. 1979).

Here, the Court has not found that any of Benedict's acts or omissions was constitutionally deficient.  Even assuming deficient performance, the Court finds that Petitioner has not demonstrated that the cumulative effect of these alleged errors was prejudicial.

## II.    IAC on Direct Appeal

Petitioner argues that appellate counsel was constitutionally ineffective for failing to raise a claim of prosecutorial misconduct based on allegedly improper statements during opening statement and closing argument.  (Doc. 169 at 56–64.)  He argues that the prosecutor improperly vouched for the credibility of key state witnesses and offered his personal opinion

as to Petitioner's guilt.

To establish a claim of ineffective assistance of appellate counsel, a petitioner must show that counsel's appellate advocacy fell below an objective standard of reasonableness, and that there is a reasonable probability that, but for counsel's deficient performance, the petitioner would have prevailed on appeal. *Smith v. Robbins*, 528 U.S. 259, 285–86 (2000). "A failure to raise untenable issues on appeal does not fall below the *Strickland* standard," *Turner v. Calderon*, 281 F.3d 851, 872 (9th Cir. 2002); nor does appellate counsel have a constitutional duty to raise every nonfrivolous issue requested by a petitioner. *Miller v. Keeney*, 882 F.2d 1428, 1434 n.10 (9th Cir. 1989) (citing *Jones v. Barnes*, 463 U.S. 745, 751–54 (1983)).

### A.    Vouching

Under Arizona law, impermissible prosecutorial vouching occurs when (1) the prosecutor "places the prestige of the government behind its witness," or (2) the prosecutor "suggests that information not presented to the jury supports the witness's testimony." *State v. Vincent*, 768 P.2d 150, 155 (Ariz. 1989).

Petitioner first argues that during opening statement the prosecutor referred to facts not admitted at trial to imbue credibility to Mize. Specifically, after describing Petitioner's statements to Mize about the double homicide, the prosecutor stated: "And Brian Mize can't really believe what he is hearing from Richard Greenway and he starts checking. And when he finds out it is true, he calls the Sheriff's Department and Brian Mize then gives statements." (RT 3/14/89 at 53.) Petitioner argues that the prosecutor never explained to the jurors what Mize learned to lead him to conclude that Petitioner's statement was true. This, Petitioner argues, improperly suggested that information not presented to the jury supported Mize's testimony. The Court disagrees.

Mize testified during trial that after Petitioner's account of the murders, he "didn't believe it at first." (*Id.* at 163.) He further testified that when he went home the next day,

he "read about a double murder in the newspaper and read Richard had been arrested, so I called my mom and discussed it with her what I should do and finally decided to call the homicide department." (*Id.*) Thus, as the prosecutor anticipated in opening statement, Mize testified to "checking" on Petitioner's story by reading a newspaper account and learning that a double homicide had in fact been committed, just as Petitioner had described to him. The prosecutor's statement did not refer to extrinsic evidence or amount to improper vouching. Therefore, appellate counsel was not ineffective for not raising this claim on appeal.

Petitioner next argues that the prosecutor gave jurors the impression that Mize and Schmanski had been scrutinized by both the prosecution and defense prior to trial to ensure they were telling the truth. The prosecutor stated:

> And when these witnesses testify, believe me, folks, they are not just going to get up there—and it is not going to be the first time. What happens is, before you get here I get a chance to talk to them, Mr. Benedict gets a chance to talk to them, so people start pulling out transcripts and asking: Didn't you say this and didn't you say that. The reason is, everybody gets a chance to talk to them before they come down to testify.

(*Id.* at 53–54.) Petitioner contends that the prosecutor essentially vouched for the veracity of the witnesses' testimony and suggested their testimony would not be inconsistent with their prior statements. The Court again disagrees.

The prosecutor's opening statement declared only that the witnesses had been interviewed by the parties before trial and that their earlier statements might be referenced during their testimony. This did nothing more than explain a procedure commonly employed during examination of witnesses. The statement did not vouch for the truthfulness of either the anticipated testimony or the witnesses' prior statements. Thus, the statement here is in sharp contrast to that found to be improper vouching in *Vincent*, where the prosecutor told jurors that "the State wouldn't have put [the witness] on the witness stand if they didn't believe every word out of his mouth about the conversations he had." 768 P.2d at 155. Because the prosecutor's statement did not constitute improper vouching, appellate counsel was not ineffective for not raising this claim on direct appeal.

Finally, Petitioner argues that the prosecutor improperly vouched for Schmanski and Mize during rebuttal closing argument:

> I will submit to you without additional comment, the testimony of Mr. Schmanski, recognizing Mr. Schmanski has a drinking problem, recognizing he is an alcoholic, you talk about the testimony of Anthony Schmanski and I submit to you when you do there is not a question in the world.
>
> . . .
>
> I ask you to limit your consideration of this case to the testimony of the witnesses. You consider Schmanski and Mize. There is no question they are telling the truth about what happened.

(RT 3/16/89 at 101–02.)

Because trial counsel did not object to this alleged vouching, the Arizona Supreme Court would have reviewed this claim only for fundamental error had it been raised by appellate counsel on direct appeal. In determining whether a prosecutor's improper statement constitutes fundamental error, Arizona courts "examine, under the circumstances, whether the jurors were probably influenced and whether the statement probably denied [the defendant] a fair trial. *State v. Bible*, 858 P.2d 1152, 1204 (Ariz. 1993). "A proper cautionary instruction to the jury may sufficiently mitigate the effects of impermissible argument." *State v. King*, 514 P.2d 1032, 1039 (Ariz. 1973).

Here, even assuming the prosecutor's closing argument improperly vouched for the credibility of the witnesses, there is no reasonable probability this claim would have succeeded on direct appeal. First, the trial court instructed the jury that "what the lawyers will say in their closing arguments is not evidence." (RT 3/16/89 at 74.) Arizona courts have frequently found that such an instruction ameliorates instances of prosecutorial vouching. *See State v. Lamar*, 72 P.3d 831, 841–42 (Ariz. 2003) (citing cases). Second, the statement here is no more egregious than those made in other cases in which Arizona courts have found no fundamental error. *See, e.g.*, *Bible*, 858 P.2d at 1204 (finding no fundamental error where prosecutor both vouched for credibility of witnesses and suggested other persons not called to testify supported the witnesses' testimony); *King*, 514 P.2d at 1039 (finding no

fundamental error where prosecutor made at least two avowals as to witness's credibility). Third, given the strong evidentiary case against Petitioner, it is highly improbable the Arizona Supreme Court would have found that the jury was improperly influenced by the prosecutor's closing argument or that Petitioner was denied a fair trial. Therefore, the Court finds that appellate counsel was not ineffective for failing to raise this claim on appeal.

### B.    Personal Opinion

Petitioner asserts that in closing rebuttal argument the prosecutor impermissibly gave his personal opinion regarding guilt. The supplemental merits brief references two pages of trial transcript but does not identify the allegedly improper statement. It appears from the reply brief, however, that Petitioner's claim stems from the prosecutor telling jurors, "I don't think there is any question to you at all that Mr. Greenway is responsible for shooting and killing two people, Mindy Peters and Lili Champagne." (RT 3/16/89 at 101.) The defense did not object or request that the statement be stricken.

Respondents argue that this statement did not express a personal opinion as to guilt, but inferred that the State had met its burden. Respondents further argue that, even if improper, the statement did not deprive Petitioner of a fair trial or otherwise influence the jury such that it constituted fundamental error.

"It is well-settled law in Arizona that, although attorneys are given wide latitude in their arguments to the jury, an attorney should never express his personal belief in the defendant's guilt or innocence." *State v. Williams*, 556 P.2d 317, 319 (Ariz. 1976). In *Williams*, the court found no error in the prosecutor telling jurors, "I think the evidence shows that [the defendant] is guilty beyond a reasonable doubt." *Id.* Similarly, in *State v. Maddasion*, the court found nothing improper in the prosecutor telling the jury that he was "a concerned citizen like most of you are and should be" and that the defendant "is a dealer in heroin, a white-collar criminal, ladies and gentlemen, and I submit to you that is a fact and I submit to you that the State has proved that he sold the six rolls of heroin." 539 P.2d 966

1
2
3
4

(Ariz. App. 1975); *see also State v. Galbraith*, 559 P.2d 1089, 1092–93 (Ariz. App. 1976) (finding no impropriety where prosecutor told jury, "I submit to you that the facts presented in this case show beyond a reasonable doubt that the defendant did, in fact, make a false telephone message, and the elements of the statute have been clearly satisfied.").

5
6
7
8
9
10
11
12
13
14

Here, prior to making the challenged statement, the prosecutor described the inculpatory evidence. He stated that Petitioner knew Mindy Peters, knew where she lived, possessed items taken from her home, including the Porsche keys, and left fingerprints on the gun, Porsche, and other stolen items. The prosecutor next commented on defense counsel's closing argument, noting that "anything is possible, but that's not the standard of proof." (RT 3/16/89 at 100.) He then reminded the jury about Petitioner's statements to Mize and Schmanski and specifically noted that Mize's testimony was consistent with other evidence, including Petitioner's sister's observation of Petitioner getting into the Porsche at her home. It was at this point that the prosecutor remarked: "And, folks, I don't think there is any question to you at all that Mr. Greenway is responsible . . . ."

15
16
17
18
19
20
21
22
23
24
25
26
27

In isolation, the prosecutor's statement may be construed as suggesting a personal opinion. However, when read in context, it is instead a suggestion that the evidence supported a finding of guilt. *See Bible*, 858 P.2d at 1205 (observing that during closing arguments counsel may suggest ultimate conclusions). Given the wide latitude afforded attorneys in closing argument, the trial court's instruction to the jury that what is said in closing arguments is not evidence, as well as the lack of objection, the Court finds no reasonable probability the Arizona Supreme Court would have found that the prosecutor's statement was improper or, even if improper, that it constituted fundamental error. *Cf. State v. Van Den Berg*, 791 P.2d 1075, 1080 (Ariz. App. 1990) (finding no fundamental error where there was no objection to solitary comment and jury was instructed that attorneys' opinions are not evidence). Therefore, appellate counsel was not ineffective for failing to raise this claim on appeal.

28

1    **III.    Disclosure Violation**

2        In his post-remand supplemental merits brief, Petitioner raises for the first time a

3    claim alleging that the prosecution violated its obligation to disclose exculpatory or

4    impeachment evidence.  (Doc. 169 at 64–67.)  He seeks merits review of the claim and

5    alternatively suggests that the Court should stay these proceedings so that he may return to

6    state court to exhaust it.

7        As correctly noted by Respondents (Doc. 177 at 37), this claim is not properly before

8    the Court.  Petitioner did not raise the claim in state court or in his federal habeas petition.

9    Nor has he requested amendment under Rule 15(c) of the Federal Rules of Civil Procedure.

10   In addition to being unexhausted and in all likelihood untimely, *see Mayle v. Felix*, 545 U.S.

11   at 664 (holding that untimely amended claim must share common core of operative facts with

12   claim raised in timely-filed habeas petition to relate back under Rule 15), the claim is plainly

13   meritless.  *See Rhines v. Weber*, 544 U.S. 269, 277 (2005) (noting that district court would

14   "abuse its discretion" by granting a stay where an unexhausted claim is "plainly meritless").

15       Failure to disclose information that might have been helpful in conducting cross-

16   examination amounts to a constitutional violation only if it deprives the defendant of a fair

17   trial. *United States v. Bagley*, 473 U.S. 667, 676 (1985); *Brady v. Maryland*, 373 U.S. 83, 85

18   (1963).  The failure to disclose such evidence is material, and therefore prejudicial, "if there

19   is a reasonable probability that, had the evidence been disclosed to the defense, the result of

20   the proceeding would have been different."  *Strickler v. Greene*, 527 U.S. 263, 280, 282

21   (1999) (quoting *Bagley*, 473 U.S. at 682).

22       Petitioner asserts that the Mize NCIC report found by habeas counsel in the

23   prosecution's file should have been disclosed because the defense could have impeached

24   Mize with the information concerning his *arrest* for DWI-related involuntary manslaughter.

25   As already discussed above with regard to Petitioner's IAC claim concerning Benedict's

26   failure to fully investigate Mize's DWI and military discharge, nothing in the NCIC report

27

28

could have been used by Benedict at trial under Arizona's rules of evidence. The report does not indicate any felony convictions or misconduct demonstrating an untruthful character. *See* Ariz. R. Evid. 608(b), 609. Therefore, the report was not material and its disclosure was not required. *See United States v. Sarno*, 73 F.3d 1470, 1505 (9th Cir. 1995) (stating that non-disclosure of inadmissible evidence does not give rise to a *Brady* violation).

**IV.    Juror Misconduct**

Following conclusion of the post-remand supplemental merits briefing, Petitioner filed a motion to stay these proceedings pending exhaustion in state court of a claim alleging misconduct by juror Virginia Coker for her failure to disclose during voir dire that she had been the victim of a violent crime. (Doc. 183.) Petitioner did not include this claim in his amended federal habeas petition, despite having the information about Coker since 1994. Nor has he moved to amend to add the claim.

In *Rhines v. Weber*, the Court was confronted "with the problem of a 'mixed' petition for habeas corpus relief in which a state prisoner presents a federal court with a single petition containing some claims that have been exhausted in the state courts and some that have not." 544 U.S. at 271. The Court ultimately held that a mixed petition may be held in abeyance pending exhaustion of unexhausted claims in state court if the petitioner demonstrates good cause for the failure to exhaust the claims first in state court and shows that the claim is not plainly meritless. *Id.* at 277. However, the holding in *Rhines* presupposes that an unexhausted claim was actually raised in the federal habeas petition. That is not the case here. Simply put, because Petitioner did not raise the juror misconduct claim in his amended petition or seek amendment (and demonstrate timeliness under *Felix*), there is no basis for staying these proceedings or delaying issuance of final judgment. Therefore, the motion for stay and abeyance under *Rhines* is denied.

**CONCLUSION**

The Court finds that none of the trial and appellate IAC claims raised by Petitioner in

his amended federal habeas petition warrant relief and that an evidentiary hearing on these claims is neither warranted nor required.  The Court also declines to stay these proceedings pending exhaustion of claims that were not included in the amended habeas petition and are not properly before this Court.

## CERTIFICATE OF APPEALABILITY

Rule 22(b) of the Federal Rules of Appellate Procedure provides that when an appeal is taken by a petitioner, the district judge who rendered the judgment "shall" either issue a certificate of appealability (COA) or state the reasons why such a certificate should not issue. Therefore, in the event that Petitioner appeals and pursuant to Rule 11(a) of the Rules Governing Section 2254 Cases, this Court has evaluated the claims within the petition for suitability for the issuance of a COA.  *See* 28 U.S.C. § 2253(c); *Turner v. Calderon*, 281 F.3d 851, 864–65 (9th Cir. 2002).

Pursuant to 28 U.S.C. § 2253(c)(2), a COA may issue only when the petitioner "has made a substantial showing of the denial of a constitutional right."  With respect to claims rejected on the merits, a petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  For procedural rulings, a COA will issue only if reasonable jurists could debate whether the petition states a valid claim of the denial of a constitutional right and whether the court's procedural ruling was correct.  *Id.*

The Court finds that reasonable jurists could debate its resolution of Petitioner's claim alleging ineffective assistance of trial counsel for failing to present a reasonable theory of defense and failing to pursue a *Christensen* defense.  For the reasons set forth in this Order, the Court declines to grant a COA on any of the remaining issues.

Based on the foregoing,

**IT IS ORDERED** denying on the merits Petitioner's claims alleging ineffective assistance of counsel during trial and on direct appeal.

1    **IT IS FURTHER ORDERED** denying Petitioner's Amended Petition for Writ of

2  Habeas Corpus (Doc. 61).  The Clerk of Court shall enter judgment accordingly.

3    **IT IS FURTHER ORDERED** denying Petitioner's Motion to Stay Proceedings and

4  Hold in Abeyance (Doc. 183).

5    **IT IS FURTHER ORDERED** granting a certificate of appealability on the following

6  issues:

7   Whether Petitioner's claim alleging ineffective assistance of trial counsel for failing
    to present a reasonable theory of defense and failing to pursue a *Christensen* defense
8   is properly before this Court for consideration, and, if so, whether the claim lacks
    merit.
9

10    **IT IS FURTHER ORDERED** that the Clerk of Court send a courtesy copy of this

11 Order to the Clerk of the Arizona Supreme Court, 1501 W. Washington, Phoenix, Arizona

12 85007- 3329.

13    DATED this 27th day of November, 2013.

14

15

16

17  _____

18  Raner C. Collins
    Chief United States District Judge

19

20

21

22

23

24

25

26

27

28

- 38 -